538 So.2d 440 (1989)
John EDWARDS, Appellant,
v.
STATE of Florida, Appellee.
No. 70004.
Supreme Court of Florida.
January 19, 1989.
Rehearing Denied March 16, 1989.
James Marion Moorman, Public Defender and Steven L. Bolotin, Asst. Public Defender, Bartow, for appellant.
*441 Robert A. Butterworth, Atty. Gen., and Gary O. Welch, Asst. Atty. Gen., Tampa, for appellee.
BARKETT, Justice.
John Edwards appeals his convictions of first-degree murder and conspiracy to commit first-degree murder and his sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We reverse his convictions and remand for a new trial.
On the morning of April 27, 1986, two fishermen found Ireland Boyd's body in a drainage ditch. The cause of death was blunt trauma to the head. After identifying the body, the victim's wife, Mary Boyd, told police that Ireland, also known as "Hillbilly," had left the night before in a pickup truck. Several days later, after further questioning, she gave a statement implicating herself and Edwards, her neighbor. She and Edwards were arrested and charged with murder and conspiracy to murder. Under a plea agreement with the state, Mary Boyd pleaded guilty to second-degree murder, for which she received twelve years in prison, in exchange for her testimony at Edwards' trial.
At trial, Mary Boyd told the jury that her husband drank most of the time and when he drank, he beat her and their children. He also abused her sexually. In the months preceding the murder, she had told several people, including Edwards, that she wished her husband were dead. Edwards' response, according to Mary, was that he "knew people that got rid of people." When she replied that she did not have that kind of money, Edwards told her she would not need money.
Mary testified that Ireland had been drinking with a friend most of the day of April 26, 1986, and was drunk when he returned home around 7:30 p.m. That evening, she, Ireland, Edwards, and Sharon Brown, Edwards' girl friend, watched a Kirk Douglas movie on television. During the movie, Ireland decided to show his guests how a "real man" did it and attempted to force Mary to have sex in front of their guests. Sharon Brown got upset and left immediately; Edwards left shortly afterwards.
After this episode, Ireland decided to go to another local bar and forced Mary to wake the children and take him there. When the bar refused to allow the children inside, Ireland bought some more liquor and they returned home. At this point, Edwards returned and Ireland urged him to accompany him to another bar. Mary testified that as they sat there, she remarked to Edwards that "this would be a good time to get rid of somebody." Edwards eventually agreed to go with Ireland.
The two men went to a neighborhood poker party and then returned to the Boyds' house where more drinks were consumed. Ireland then decided he wanted to go out again, took his bottle, and with Mary's help, got into the car. As she walked back to the house, Mary saw Edwards, who had been sitting on the hood of the car, walk towards his house. She then went into her house and laid down on the couch. She heard Ireland yelling for Edwards and heard a car door shut but did not hear the car start. She dozed off and was awakened later that night by a sound at the door. When she opened the door, Edwards gave her back her car keys and told her she did not have to worry because Ireland would not bother her any more and it was time to pay her part of the bargain.[1] They had sex on the couch and Edwards left.
The other key state's witness was Jeffrey Walters, who identified Edwards as the person he saw with Hillbilly Boyd at a *442 Quick Stop gas station around midnight the night Boyd was killed.
Prior to trial, the police had conducted a lineup at which Edwards' previously appointed counsel was not present. Although Walters did not identify Edwards at the time of the lineup, he later told police he recognized Edwards in the lineup as the man he saw with Hillbilly Boyd the night Boyd was killed.[2] Defense counsel moved to suppress both the lineup and Walters' in-court identification. The trial judge agreed that the lineup violated Edwards' right to counsel but permitted Walters to identify Edwards at trial.
The main defense witnesses at trial were Paula VanWormer and her eleven-year-old son, Glen, who lived in a trailer nearby. Paula testified that she went back to her trailer after the neighborhood card game broke up. She heard Ireland Boyd screaming and cursing at Edwards, looked outside, and saw Edwards walking through the alley toward his own apartment. Paula testified that Edwards apparently had promised to take Ireland to a bar and Ireland was saying, "You're a liar. Look at that. You're locking the door. You're going in. You're not taking me anywhere." Ireland then threw up his hands and walked back toward his house. Paula said she went outside and talked to Edwards for about fifteen minutes. Edwards then went inside his house.
Glen VanWormer testified that he was lying in his bed around 2 a.m. the night of the murder when he looked out his window, saw a truck pull out and heard someone say something like, "Come on, Hillbilly." He said Ireland Boyd got into the back of the truck and it left.[3]
The jury found Edwards guilty as charged and recommended the death penalty by a vote of eight to four. The trial judge, finding three aggravating circumstances and no mitigating circumstances, sentenced Edwards to death.
Appellant first contends that the trial court erred in failing to exclude Walters' courtroom identification. Appellant argues that the totality of the circumstances in this case failed to overcome the presumption that the in-court identification was unreliable and tainted by the illegal lineup. We agree.[4]
There are two situations which may require exclusion of in-court identification testimony. The first is when the police have obtained a pretrial lineup identification in violation of the defendant's right to counsel. See United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). The second is when the police have obtained a pretrial identification by means of an unnecessarily suggestive procedure. See Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). In both situations, the in-court identification may not be admitted unless it is found to be reliable and based solely upon the witness' independent recollection of the offender at the time of the crime, uninfluenced by the intervening illegal confrontation.[5]Wade; Neil.
*443 In gauging the reliability of an in-court identification, the trial judge must consider the following factors: the prior opportunity the witness had to observe the alleged criminal act; the existence of any discrepancy between any pretrial lineup description and the defendant's actual description; any identification prior to the lineup of another person; any identification by picture of the defendant prior to the lineup; failure to identify the defendant on a prior occasion; any time lapse between the alleged act and the lineup identification; and any other factors raised by the totality of the circumstances that bear upon the likelihood that the witness' in-court identification is not tainted by the illegal lineup.[6]Wade, 388 U.S. at 241, 87 S.Ct. at 1939.
In the instant case, defense counsel moved to exclude Walters' lineup and in-court identifications under both theories. Finding the lineup illegal on right to counsel grounds, the trial court conducted a hearing to determine the admissibility of Walters' in-court identification.
At the hearing, Walters testified that he and James Norman were at a Quick Stop getting gas when a big brown car drove up. Walters stated that his attention was called to the car when Ireland Boyd yelled something out to Norman. Walters said he glanced over at the car for about three or four seconds, dividing his glance between the passenger (Boyd) and the black male driver. When asked whether he took a look at the driver, he replied, "Yes, barely. I just glanced over." Walters testified that the artificial lighting around the gas pumps was very bright, but he saw only the outline of the driver's face.
Walters testified that when initially questioned by police, he described the person with Ireland as a black man with short hair, dark eyes, and a round face. This testimony was corroborated by the police detective to whom Walters gave the description.
Walters told the court he did not tell the police that he recognized Edwards at the lineup because he was violating his probation in New York by being in Florida. Walters also testified that on either the afternoon of the lineup or the following day, he saw Edwards' picture in the paper under headlines identifying him as the suspect.
James Norman testified at the suppression hearing that on the night in question, he spoke with the victim at the Quick Stop but paid little attention to the man in the driver's seat, whom he described to police as heavy-set with a round face. He said he knew both the victim and appellant from working with them at a roofing company. He said he barely glanced at the driver and could not say one way or the other whether he was Edwards. Norman testified that the police originally intended to show him the lineup but abandoned the idea after learning that he knew the suspect.
The trial court also heard testimony and argument concerning the suggestiveness of the lineup procedure. The court then denied the motion to suppress the in-court identification.
We note initially that the trial judge did not make a specific finding on whether Walters' in-court identification was tainted by the illegal lineup.[7] Nonetheless, the *444 pertinent facts were fully developed at the suppression hearing and at trial,[8] and the parties addressed the issue at those proceedings and on this appeal. Accordingly, we find the record fully adequate to permit an informed judgment by this Court. See Wade, 388 U.S. at 218, 87 S.Ct. at 1928; Gilbert, 388 U.S. at 272, 87 S.Ct. at 1956; United States v. Anderson, 714 F.2d 684, 687 (7th Cir.1983); State v. Mitchell, 593 S.W.2d 280, 285 (Tenn.), cert. denied, 449 U.S. 845, 101 S.Ct. 128, 66 L.Ed.2d 53 (1980).
It is the state's burden to show by clear and convincing evidence that the courtroom identification had an independent source or that its introduction into evidence was in any event harmless error. Wade, 388 U.S. at 242, 87 S.Ct. at 1940; Gilbert, 388 U.S. at 272, 87 S.Ct. at 1956. The state has failed to meet either burden.[9]
Walters' own testimony compellingly demonstrates that his opportunity to observe the man in the car with Ireland Boyd was minimal. He observed the car for only three or four seconds. For these few seconds, his attention was divided between the driver and the passenger. Walters stated moreover that he had no reason to pay attention to the car; consequently, he "barely glanced over and only saw the outline of the driver's face." We also take note of the fact that as Walters sat in the witness room prior to testifying, several persons overheard him say he did not understand why they flew him all the way from New York when all he saw was the outline of the man's face. As the Court recognized in Wade, the dangers for the accused "are particularly grave when the witness' opportunity for observation was insubstantial." 388 U.S. at 228-29, 87 S.Ct. at 1932-33.
Nor does Walters' prior description of the person he saw at the Quick Stop support an independent basis for the courtroom identification. Although Walters' prior description fits appellant, it also fits the general description of many black males.
None of the other indicia of reliability enumerated in Wade or Neil supports an independent basis for Walters' courtroom identification. Thus, we cannot conclude from this record that Walters' in-court identification rested solely upon his observations at the Quick Stop and was not at all induced by the lineup.
Having found the courtroom identification improper evidence in this case, we must determine whether its admission into evidence was harmless. We note in this regard that during its deliberations during the guilt phase, the jury asked for a transcript of the testimonies of Mary Boyd and Walters. The trial judge told the jurors to try to reach a verdict without the transcripts. But he commented afterward that Walters' and Mary Boyd's testimonies were the crux of the state's case and that Walters' testimony was essential to corroborate Mary's testimony, which was "wrought with inconsistencies." After reviewing the entire record, we fully concur with these observations and conclude that the admission of Walters' courtroom identification *445 was not harmless beyond a reasonable doubt.
Appellant thus is entitled to a new trial at which Walters will not be allowed to identify him. We reverse and remand for further proceedings consistent with this opinion.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, GRIMES and KOGAN, JJ., concur.
SHAW, J., dissents.
NOTES
[1] This part of Mary Boyd's testimony was impeached with the transcript of her prior statement to police, as follows:

Detective Fleeman: We left something out of this, I think. What did [Edwards] say when he came back that night? Didn't he tell you you wouldn't have to worry about Ireland any more?
Mary: No.
Detective Fleeman: He didn't say that?
Mary: No, he just told me he left him somewhere.
Detective Fleeman: He didn't say that you wouldn't have to worry about him anymore?
Mary: Why would he have said that. I would have known something was wrong.
[2] The record does not indicate when Walters told police the man in the lineup was the man he saw with Ireland Boyd the night of the murder.
[3] This testimony was impeached with a prior statement in which Glen told police it may have been Sunday night, after Boyd was already dead, that he saw the truck because he remembered missing school the following day.
[4] Our resolution of this issue makes it unnecessary to address appellant's remaining points.
[5] Where a pretrial identification is obtained in violation of the right to counsel, the pretrial identification is per se inadmissible at trial. Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). A per se exclusionary rule was deemed necessary to assure that the police and the prosecution would respect the accused's right to have counsel present at the lineup. Id. at 273, 87 S.Ct. at 1957. A pretrial identification obtained from a suggestive procedure, on the other hand, is not per se inadmissible, but may be introduced into evidence if found to be reliable and based upon the witness' independent recall. Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).
[6] These are substantially the same factors set forth in Neil: opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. 409 U.S. at 199, 93 S.Ct. at 382.
[7] The state argued below, and continues to press the point here, that unless the lineup procedure is determined to be impermissibly suggestive, the in-court identification is admissible. The state contends that this is so even when the pretrial lineup identification has been excluded on right to counsel grounds. The state's position is patently wrong. As we already have noted, the reliability requirement for in-court identification testimony following an illegal lineup originated in the context of a right to counsel violation. As the Court explained in Wade:

A rule limited solely to the exclusion of testimony concerning identification at the lineup itself, without regard to admissibility of the courtroom identification, would render the right to counsel an empty one. The lineup is most often used, as in the present case, to crystallize the witnesses' identification of the defendant for future reference. We have already noted that the lineup identification will have that effect. The State may then rest upon the witnesses' unequivocal courtroom identification, and not mention the pretrial identification as part of the State's case at trial. Counsel is then in the predicament in which Wade's counsel found himself  realizing that possible unfairness at the lineup may be the sole means of attack upon the unequivocal courtroom identification, and having to probe in the dark in an attempt to discover and reveal unfairness, while bolstering the government witness' courtroom identification by bringing out and dwelling upon his prior identification. Since counsel's presence at the lineup would equip him to attack not only the lineup identification but the courtroom identification as well, limiting the impact of violation of the right to counsel to exclusion of evidence only of identification at the lineup itself disregards a critical element of that right.
388 U.S. at 240-41, 87 S.Ct. at 1939-40.
[8] Walters' testimony at trial was essentially the same as his testimony at the pretrial hearing.
[9] The state has not even attempted to meet its burden but persists in arguing that the independent source test does not apply unless the lineup is found to be suggestive.