717 So.2d 1057 (1998)
Sirron J. JOHNSON, Appellant,
v.
STATE of Florida, Appellee.
No. 96-3682.
District Court of Appeal of Florida, First District.
August 13, 1998.
*1059 Nancy A. Daniels, Public Defender and Steven A. Been, Assistant Public Defender, Tallahassee, for Appellant.
Robert Butterworth, Attorney General, and Giselle Lylen Rivera, Assistant Attorney General, Tallahassee, for Appellee.
KAHN, Judge.
A man identified at the trial of this case as Sirron Johnson accosted and raped three Jacksonville women between December 30, 1994, and January 31, 1995. Although Johnson was charged with crimes involving each of the three victims, the counts involving one victim, C.R., were severed and tried separately. The present appeal arises out of Johnson's conviction for the January 31, 1995, armed kidnaping, armed sexual battery, and armed robbery of C.R.. Over a defense objection, the trial court allowed the jury to hear collateral crime evidence from Mr. Johnson's other two rape victims, P.W. and N.B.. On appeal Johnson raises the following issues:
(1) Whether the trial court erred in overruling the defense objection to the State's peremptory strike of a black juror;
(2) Whether the conduct of the prosecution in procuring P.W. and N.B.'s identification of Johnson violated Johnson's due process rights;
(3) Whether the trial court erred in overruling defense objections to evidence of the P.W. and N.B. collateral crimes; and
(4) Whether the departure sentence imposed by the trial court is invalid because the judge failed to orally articulate the reasons for departure at the time sentence was imposed.
The fourth issue is not preserved for appeal. We affirm the trial court's rulings as to the other three issues.

The Crimes
Around noon on December 30, 1994, P.W. parked her car at the Independent Life Insurance office on Atlantic Boulevard in Jacksonville. The office is near Art Museum Drive. After conducting some business for her employer in the insurance office, she returned to her car. When she opened her car door, a man, whom she identified at trial as Sirron Johnson, came up behind her with a gun. P.W. identified the gun as a small black automatic pistol. Johnson pushed the gun into P.W.'s back and asked for her purse. He then asked for her jewelry. He next instructed her to unlock the passenger door so he could enter the car. He opened the door after pulling his jacket over his hand. Johnson then ordered her to drive out of the Independent Life driveway and proceed to the Atlantic Gardens Apartments. After she parked the car, Johnson took her out of the car and walked her to the back of the apartment complex where there was a tall wooded fenced-in area that apparently housed certain mechanical equipment for the apartment complex. While holding the gun on her, Johnson forced her to remove her clothes and stand facing a wall. At that point, and for the first time, Johnson instructed P.W. that she should no longer look at him. He then forcibly penetrated her.
On January 13, 1995, at around 11:30 a.m., N.B. was waiting at a bus stop on Art Museum Drive. The bus stop is directly across the street from the Atlantic Gardens Apartments. After a few minutes, a man identified by N.B. at trial as Sirron Johnson, approached her and questioned her about when the next bus would be arriving. When, after a few minutes, she sat down on the bench, Johnson stood over her and placed a gun to her side. N.B. described the gun as a very dark semi-automatic pistol. Johnson then demanded that N.B. hand over any belongings she had. N.B. told Johnson that he could take her purse and asked him just not to hurt her. He told her that he could not take the purse at the bus stop because people might see. He then walked her across the street by threatening to kill her if she did not go with him. After crossing the street, Johnson took N.B. to an empty apartment at the *1060 Atlantic Gardens Apartments. Once in the apartment, Johnson instructed N.B. to take off all her clothing. Johnson then rifled through N.B.'s belongings. N.B. testified that while Johnson was doing this, he pulled his shirt sleeves over his hands. Johnson then ordered N.B. to lie down on the floor and, for the first time, Johnson covered N.B.'s face so that she could no longer see. After probing her vagina with his pistol, Johnson raped N.B..
On January 31, 1995, at around 8:30 a.m., C.R. arrived at Commonwealth Land and Title Insurance Company, her place of employment, and parked her car near the office door she normally used. After she entered the doorway, she noticed a man, identified by her at trial as Sirron Johnson, in the stairwell. Johnson grabbed her shoulder and ordered her to turn over her money. Johnson had a gun in his hand, described by C.R. as a black semi-automatic pistol. C.R. gave Johnson $40.00, and Johnson then told her "we're going to go get in your car, and we're going to drive to a stoplight, and you are going to let me out of your car. If you scream or try to run, I'm going to kill you." Once in the car, Johnson directed C.R. to a nearby apartment complex, the Atlantic Garden Apartments. During the time Johnson was in C.R.'s car, he did not touch anything, and made a point to pull his sleeves down over his hands before he got out of the car. At the apartment complex, Johnson led C.R. to the back of the apartments to a fenced-in area which housed mechanical equipment. After going through her purse and wallet, Johnson ordered C.R. to take off all her clothes. She complied after he threatened to kill her if she did not remove her clothing. Then, for the first time, Johnson told C.R. to close her eyes, and warned her that if she opened her eyes he would kill her. After forcing her to lie down on top of her clothes, Johnson raped C.R.

The Initial Identifications
P.W. promptly reported the rape and shortly thereafter went to the police station to assist with the preparation of a composite drawing of her assailant. This composite was published to the jury at trial. Several days later, Jacksonville Detective Royal asked P.W. to return to the police station and look at a photo spread. Shown a photo spread of six black men, P.W. selected the person, identified as number 3 on the photo spread, as the rapist.
N.B. called the police from her apartment after being raped. She then went with Jacksonville Detective Terry to the police station to assist in preparing a composite sketch of her attacker. The sketch N.B. assisted in was published to the jury at trial. Sometime after preparing the sketch, N.B. returned to the police station to view a photo spread. Detective Terry presented the same photo spread he had earlier shown to P.W., and N.B. selected the same person, number 3, from the photo spread.
After her rape, C.R. returned to her office where someone called the police. A few days later, C.R. met with Detective Terry to look at some photographs at the police station. He showed C.R. a series of photographs and told her that she should only identify someone if she was "a hundred percent sure that that was the person who had done this." She felt that one photograph could have been the person who committed the rape, but she did not identify that person because she was not positive. Later, on February 23, 1995, C.R. was asked to come to the police station. Detective Terry wanted her to view a lineup. He told her beforehand to look at each person in the lineup carefully and not to identify anyone if she was not sure. At trial she described the lineup procedure in her own words:
Q.(BY MS. BAER): What happened when you first walked into the room.
A. When I first walked into the room, and when I first saw the people, I recognized him immediately. I think probably after the second person stepped forward and said, "Do you have any valuables in your purse," I looked at Detective Terry and Libby Senterfitt and said, "Do we have to do it? I already know who it is." And Detective Terry said, "Yes, you need to have everyone speak and look at everyone carefully." And so I did.
Q. And what was it, did you go through the whole procedure?
A. Yes, I did.

*1061 Q. And did you make a positive identification?
A. Yes, I did.
Q. And who did you identify?
A. Sirron Johnson.
Q. And you just pointed. Are you referring to this man at the table?
A. Yes.
Q. What was it about the person in the lineup that you knew it was him?
A. I just looked at him and knew. I felt sick, I started shaking, and I just knew it was him, there wasn't a doubt.
Q. Did you tell Detective Terry that you selected Sirron Johnson?
A. Yes.
Q. Did you make a positive identification?
A. Yes, I did.

Subsequent Identifications by P.W. and N.B.
The person initially identified by both P.W. and N.B. was someone other than Sirron Johnson. His name was Jessie Ellis. A year after the mistaken identifications, a prosecutor told P.W. and N.B. that Jessie Ellis was not the man who had raped them because his DNA did not match. The prosecutor further told them that the DNA matched another person. The prosecutor told N.B. that she would be shown a picture of the man who assaulted her so she would not see him for the first time in court. Both P.W. and N.B. were shown photographs at the prosecutor's office on January 18, 1996. In addition to the victims, Detective Terry, Assistant State Attorney Baer, and Assistant State Attorney Senterfitt were present.
P.W. did not recognize the person depicted in the first, second or third photographs she was shown. In actuality, these were all photographs of Jessie Ellis, the person she mistakenly identified earlier. Although P.W. recognized the three photographs as being of one person, she did not believe any of these photographs looked like the person she had picked out of the initial photo spread shortly after the rape.
When Senterfitt showed P.W. a fourth photograph, P.W. "looked at the photograph and I immediately knew that that was the person that had assaulted me, and I flipped the picture over." P.W. recognized particular features of the man in the photograph, particularly the frowning and "the cringing of the eyes."
Senterfitt then showed P.W. the original photo spread containing the picture of Jessie Ellis. P.W. testified that the photograph of Sirron Johnson "looked like the person that I picked out in the photo spread."
N.B. also viewed additional photographs at the office of Assistant State Attorney Senterfitt. As mentioned earlier, Senterfitt told N.B. that she would be seeing the person who committed the assault so she would not have to see him for the first time in court. The four photographs shown to N.B. were the same photographs shown to P.W., although not in the same order. The first photograph did not look like the attacker. When Senterfitt produced the second photograph, N.B. recognized her attacker, primarily from his eyes, and upon viewing the photograph, she immediately left the office and vomited. Senterfitt then showed N.B. the original photo spread she had viewed shortly after the rape. She was able to identify the person she had originally picked. In her opinion, the person she selected from the photo spread did not look like the first picture she was shown that day in Senterfitt's office, although they were both photographs of Mr. Ellis. N.B., like P.W., felt that the person she selected from the photo spread bore a close resemblance to Sirron Johnson.

DNA Evidence
Although Johnson moved pretrial to suppress DNA evidence, the denial of that motion is not raised on appeal. In tests done on vaginal swabs from N.B. and P.W., before C.R.'s rape, the sperm fraction excluded Ellis, but matched Sirron Johnson. According to Dr. Martin Tracey, an expert called at trial, the probability of another person matching the DNA profile of Sirron Johnson was between one in 10 million on the low side and one in 4.5 billion on the high side. Sirron Johnson's DNA profile matched the vaginal swabs taken from all three victims. According to the State's expert, the probability that a random individual, other than Johnson, *1062 provided the DNA sample used in identification would be one in 120 million for blacks. The alternative method testified to generated a figure of one in 339,000. With regard to P.W., the probability was also one in 120 million for blacks, and one in 339,000 using the alternative method.

Peremptory Strike
Over defense counsel's objection, the court allowed the State to use a peremptory challenge to remove Mr. Pleas Thomas, a black venireman. On appeal, Johnson contends the trial judge erred in granting the peremptory strike of a black juror. Johnson, however, has failed to establish that the peremptory strike at issue was exercised as the result of "purposeful racial discrimination." Melbourne v. State, 679 So.2d 759 (Fla.1996). In evaluating the propriety of the exercise of peremptory challenges, the analysis begins with the presumption that peremptory challenges will be exercised in a nondiscriminatory manner. See Windom v. State, 656 So.2d 432 (Fla.1995). "The burden of persuasion never leaves the opponent of the strike to prove purposeful racial discrimination." Melbourne, 679 So.2d at 764. The genuineness rather than the reasonableness of the strike controls. Because genuineness of the reason turns in part on the assessment of credibility of the person offering the explanation as well as the credibility of the asserted reasons, appellate courts must rely on the superior vantage point of the trial judge who can consider the demeanor of those involved and can get a feel for what is going on in the jury selection process. See Files v. State, 613 So.2d 1301, 1305 (Fla.1992); Ratliff v. State, 666 So.2d 1008 (Fla. 1st DCA), app'd, 679 So.2d 1183 (Fla.1996). The trial court's decision is given great deference and should be affirmed unless clearly erroneous. Melbourne, 679 So.2d at 764.
Here, the trial judge conducted a Neil[*] inquiry and found the challenge was not racially motivated. Johnson has not established that the finding was erroneous and an abuse of discretion. The State challenged Pleas Thomas on the basis that he could not read as evidenced by the fact that he was the only juror who did not read the jury form and provide information as the judge had requested. The State was concerned that Thomas would not be able to keep up with written information on charts, complicated scientific evidence such as the autorads used in DNA testing, and things of that nature. Although the judge indicated that he could not make a finding of whether or not Thomas could read, he expressly commented on Thomas' failure to read the information off of the form and noted that he completed the information only in response to questioning. The court noted that special emphasis in the jury selection process seemed to be with education and indicated that would be a legitimate basis to exercise a strike. Although appellant contends on appeal that other similarly situated jurors who were white were not stricken, this claim was not raised below. See Austin v. State, 679 So.2d 1197 (Fla. 3d DCA 1996), review denied, 689 So.2d 1068 (Fla.1997).

Identification of Defendant
On appeal, Johnson contends the trial court erred in denying his motion to suppress the in-court and out-of-court identifications of P.W. and N.B.. He asserts that the suggestive identification procedures used with P.W. and N.B. violated his due process rights.
We affirm the order denying the motion to suppress the identifications based on the totality of evidence supporting the reliability of the identifications. Rulings denying motions to suppress evidence come to an appellate court clothed with a presumption of correctness, and a reviewing court will interpret the evidence and reasonable inferences therefrom in a manner most favorable to the trial court's ruling. Black v. State, 630 So.2d 609 (Fla. 1st DCA 1993), review denied, 639 So.2d 976 (Fla.1994).
Impermissibly suggestive identification procedures causing a likelihood of irreparable misidentification violate a criminal defendant's right to a fair trial, and result in a denial of due process. See Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).
*1063 The basic concern with respect to procedures employed in pretrial identifications by the victim or witness has been to eliminate or minimize the risk of convicting the innocent. See Macias v. State, 673 So.2d 176, 179 (Fla. 4th DCA), review denied 680 So.2d 423 (Fla. 1996). The inquiry is whether under the totality of the circumstances there has been a substantial likelihood of irreparable misidentification. Despite the risks of misidentification arising from a suggestive identification procedure, the United States Supreme Court in Manson declined to adopt a rule of per se inadmissibility. Instead the court must determine whether under the totality of the circumstances there has been a substantial likelihood of irreparable misidentification. See Manson; Biggers; Macias; See also Edwards v. State, 538 So.2d 440 (Fla.1989). An identification obtained from suggestive procedures may be admitted if the court finds it reliable apart from the tainted procedures. An identification resulting from a suggestive procedure is reliable where the court finds it is based solely upon the witness' independent recollection of the offender at the time of the crime, uninfluenced by the suggestiveness of the procedure. Edwards, 538 So.2d at 442. The burden is on the State to establish reliability by clear and convincing evidence. Id.
The United States Supreme Court has enumerated factors a trial court may use in assessing the reliability of an identification obtained by suggestive procedures. Biggers. These circumstances include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the length of time between the crime and the confrontation, the positiveness and manner of the witness' identification, and whether the witness expressed doubts about the selection or failed to identify the accused. Biggers, 409 U.S. at 199, 93 S.Ct. 375. The factors set forth in Biggers are not all-inclusive, and other factors may be considered. Macias, 673 So.2d at 181.
As one Florida court has explained,
In order to warrant exclusion of evidence of the identification, the identification procedures must have been so suggestive and the witness' unassisted ability to make the identification so weak, that it may reasonably be said that the witness has lost or abandoned his or her mental image of the offender and has adopted the identity suggested.
Baxter v. State, 355 So.2d 1234, 1238 (Fla. 2d DCA 1978) (citing Simmons v. United States, 390 U.S. 377, 383-84, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)).
Here, the court reviewed the totality of the circumstances and found no great risk of irreparable misidentification. In a written order, the court made the following findings:
a. Opportunity of Witness to View Criminal Act:
Each victim had an extended length of time to view the assailant. Each was accosted in one location and either drove or walked to the Atlantic Garden Apartments with the perpetrator. Each crime occurred in broad daylight and although the perpetrator wore a hat on at least two occasions, he made no effort to disguise his face nor prevent the victim from viewing him until the rape.
b. Witnesses' Degree of Attention:
It is apparent from the evidence that until the moment of the rape, the victims were all focused on the perpetrator. Each gave detailed clothing descriptions and general descriptions of the perpetrator's physical characteristics.
c. Accuracy of the Prior Descriptions:
[P.W.] gave a description which is inaccurate as to the Defendant's height, otherwise generally consistent with the Defendant but certainly not precise. The composite prepared at her direction bears a resemblance to the Appellant.
[N.B.]'s description is generally consistent with the Defendant but certainly not precise. She estimated his height below six feet but stated she was not very good at such estimates.
[C.R.]'s description is generally consistent with the Defendant in all respects, however, like the others is not precise.
d. Level of Certainty Demonstrated at Time of Confrontation:

*1064 Each witness was resolute in her identification of the Defendant. Of course, [P.W.] and [N.B.] were resolute in their earlier identifications made of another individual. [In a footnote, the court noted that the composite drawings of N.B. and P.W. are more consistent with the Defendant's appearance and inconsistent with the individual earlier identified.]
[C.R.] was resolute in her identification at the line-up and expressed such certainty that she did not wish to complete the procedure after seeing the Defendant.
e. Prior Identifications of Others or Prior Failures to Identify Defendant:
As earlier stated, [P.W.] and [N.B.] both identified another individual and expressed certainty in that identification. [C.R.] made a tentative identification but stated she needed to see the individual without the hood he was wearing at the time she made the identification. This was stated by her before she was told the individual she tentatively identified had dreadlocks. She described her assailant as having very short hair.
Her inability to earlier identify the Defendant from a photograph has been considered, however, in the Court's opinion it is not unusual for persons to be unable to identify even known persons from photographs.
f. Other Factors:
The Court has given great weight to other scientific evidence of the Defendant's guilt. In Chaney v. State, 267 So.2d 65 (Fla.1972), the court supported its findings by noting that a fingerprint was found of the Defendant which corroborated the witness' identification. In Washington v. State, 653 So.2d 362 (Fla.1994), the Court, when confronted with an unduly suggestive identification, noted that other witnesses had identified the suspect which corroborated the witness' identification. See also Baxter v. State, 355 So.2d 1234 (Fla. 2d DCA 1978)(finding independent evidence of guilt "both direct and circumstantial negates any very substantial likelihood of misidentification.") In the instant case DNA testing results substantially reduce the risk of misidentification and have been accepted and given considerable weight by the Court. The Court has considered its findings and the testimony related to the Frye hearings conducted in the instant case.
Accordingly, based upon the totality of the circumstances the Court finds that there is not a great risk of irreparable misidentification....
In his brief, Johnson focuses on the suggestive procedures employed by the prosecution. The trial court, however, recognized that these procedures were unnecessarily suggestive. The question, then, is whether, under Edwards v. State, the in-court identifications were "based solely upon the witness's independent recollection of the offender at the time of the crime, uninfluenced by the intervening illegal confrontation." 538 So.2d at 442. Johnson complains particularly of the trial court's utilization of the "other scientific evidence of the defendant's guilt." He argues that while such evidence "may be reassuring ... it plays no part in the determination of whether or not the challenged misidentification violated due process." In Chaney v. State, however, our supreme court unanimously allowed an in-court identification after a suggestive one-man photographic display, specifically noting: "[c]orroborating latent fingerprints extracted from furnishings and items in the trailer where the rape occurred were identified as belonging to appellant." 267 So.2d 65, 69.
In these types of cases it is the danger of misidentification, rather than the mere occasion of suggestion, that constitutes the basis for exclusion of identification evidence. See Biggers, 409 U.S. at 198, 93 S.Ct. 375; Baxter, 355 So.2d at 1237. Here the trial court properly noted that the attacks occurred in broad daylight, and that the assailant made no effort to disguise his face or prevent the victim from viewing him until he actually committed the rapes. The judge also noted that "each witness was resolute in her identification of the defendant." The testimony of N.B. and P.W. was particularly graphic. Upon being shown defendant's photograph for the first time, P.W. immediately flipped the picture over because she did not want to look at it. When N.B. saw the *1065 photograph of Johnson, she became physically ill. Both N.B. and P.W. felt that the person selected from the initial photospread bore a close resemblance to Sirron Johnson. Consonant with this, the trial judge found that the composite drawings, prepared just after the N.B. and P.W. rapes, were more consistent with Johnson's appearance than with that of Ellis. Under these facts, we are not prepared to say that the admittedly suggestive procedures employed by the State Attorney's Office so completely vitiated the in-court identifications by the two witnesses as to entitle Johnson to a new trial.

Collateral Crimes
The trial court did not err in admitting the testimony of N.B. and P.W. concerning their rapes. Collateral crimes evidence is admissible to prove identity, among other things, so long as its sole purpose is not to prove propensity or bad character. § 90.404(2)(a), Fla. Stat. (1995). The collateral crime evidence does not have to be "absolutely identical to the crime charged" so long as when considered together, the common points form a sufficiently unique pattern. Gore v. State, 599 So.2d 978, 984 (Fla. 1992). Here the collateral crimes, as compared to the crime for which Johnson stood trial, share multiple distinguishing characteristics.
Each of the crimes took place within a period of 32 days. Each took place between 8:30 and noon. Each abduction involved the use of a small, dark, semi-automatic gun. In each case, Johnson approached a young woman who was unaccompanied in a public place, and in the same neighborhood of Jacksonville. To accomplish the rapes, he took each victim to the same apartment complex. In each case Johnson did nothing to hide his face prior to the act, but at the moment of the rape, made threats in order to prevent the victim from looking at him during the commission. In each case, where Johnson touched property of the victims, he covered his hands with clothing. Each case involved a threat of violence, and in each case Johnson initially stated that his intent was to rob the victims of money or property. The factors taken as a whole demonstrate a unique pattern of crime commission that was relevant for the jury's consideration on the question of identity. See State v. Smith, 586 So.2d 1237 (Fla. 2d DCA 1991).

Departure Sentence
Under the sentencing guidelines, adopted by our Legislature in its wisdom, Sirron Johnson, having been convicted of armed kidnapping, armed sexual battery, and armed robbery, scored in a guideline range of 9.6 to 16 years prison. On the motion of the State, the court imposed a 45-year sentence on each count to run concurrently. The judge announced that he was departing from the guidelines and would enter a written order setting forth his reasons within seven days. In moving for a departure, the State had noted appellant's unscored juvenile offenses, escalating pattern of criminal conduct, and premeditation and calculation in the present offenses. Six days after sentencing, the court entered its written departure order noting the factors that had been argued by the State at sentencing. Counsel for appellant did not, at that time, file a motion under rule 3.800(b), Florida Rules of Criminal Procedure, concerning the departure.
On appeal appellant argues that although a trial judge may delay shortly in issuing a written departure order, the judge must orally articulate departure reasons at sentencing under Rule 3.702(d)(18)(A), Florida Rules of Criminal Procedure. Here, the trial judge did not state his reasons, orally or otherwise, at sentencing. Accordingly, argues appellant, the judge's written order does not save the departure sentence, and appellant is entitled to a guideline sentence for his crimes. We hold that the sentencing issue is not preserved for appeal because appellant made no objection at the time of sentencing concerning the trial court's failure to strictly abide by the rules of criminal procedure, nor did he file a Rule 3.800(b) motion within thirty days. Amendments to Florida Rule of Appellate Procedure 9.020(g) and Florida Rule of Criminal Procedure 3.800, 675 So.2d 1374 (Fla.1996); Johnson v. State, 697 So.2d 1245 (Fla. 1st DCA), review denied, 703 So.2d 476 (Fla.1997); and Williams v. State, 697 So.2d 164 (Fla. 1st DCA), review denied, *1066 700 So.2d 689 (Fla.1997). Indeed, it is not unlikely that defense counsel recognized that by orally announcing his intent to depart, the trial judge simply adopted the reasons articulated by the State.
AFFIRMED.
MINER and ALLEN, JJ., concur.
NOTES
[*] State v. Neil, 457 So.2d 481 (Fla.1984).