937 So.2d 828 (2006)
STATE of Florida, Appellant,
v.
Jose GOMEZ, Appellee.
No. 4D05-3094.
District Court of Appeal of Florida, Fourth District.
September 27, 2006.
*830 Charles J. Crist, Jr., Attorney General, Tallahassee, and August A. Bonavita, Assistant Attorney General, West Palm Beach, for appellant.
Carey Haughwout, Public Defender, and Dea Abramschmitt, Assistant Public Defender, West Palm Beach, for appellee.
STONE, J.
Gomez is charged with two counts of aggravated assault with a firearm involving victims Susan and Dan Sullivan. We treat the state's appeal of the order granting Gomez's motion to suppress the victims' in-court and pre-trial identifications as a petition for writ of certiorari. See State v. Houston, 616 So.2d 595 (Fla. 4th DCA 1993); State v. Mendez, 423 So.2d 621 (Fla. 4th DCA 1982). We deny the petition.
The charges arose from an incident wherein Gomez pointed a rifle at the Sullivans. At the hearing on the motion to suppress, sheriff's Detective Hewlett testified that, in taking a statement from Susan two weeks after the incident, she advised him she was concerned whether the police had the right suspect in custody because she had never identified a suspect. Hewlett then gave Susan the names of the men who had been arrested "for clarification of identification."
When Hewlett took Dan's statement the next day, Dan informed him that he had looked at Gomez's picture on the Broward County Sheriff's Office website, and he had shown a copy to Susan.
Susan said she could not recall how she first learned Gomez's name, but that, in any event, she did know that after the night of the incident and for several weeks thereafter, she was "receiving calls" from the Broward County Jail saying that Jose Gomez and another suspect, Chris Bradley, were in custody. Susan said that Dan had received the same phone calls.
*831 Susan testified she would have been able to identify Gomez prior to seeing his picture. She stated that she asked Dan to print the picture "because I wanted to see myself because I wasn't asked to identify him, I wanted to see for myself it was him. . . because I was scared to death and I wanted to make sure that person that I, that pointed the riffle [sic] at me was in jail and not someone else."
Dan said that twice he saw the person that was holding the rifle; the first time, when he got the best look, the person was probably five or six feet away, and the second time, maybe twenty or thirty yards. He stated the first look was not "a very long look because at that time I was trying to keep from getting shot at." In Dan's statement to Hewlett, he indicated that he was "looking more at the riffle [sic] he was pointing." Dan stated he had asked the police officer if Gomez had used an S.K.S. rifle, and the officer said the rifle used was similar to an S.K.S.
Dan acknowledged that he first heard Gomez's name from Hewlett. He stated that he believed if he had not been given Gomez's name, and had been asked to come in and see a photo line-up without having looked on the internet, he would have been able to identify Gomez.
Susan testified that, during the crime, three times she saw the person who pointed the rifle at them, for a few seconds each time. And, despite the darkness, she got a good look at him as he conversed with her, and there was a street light a few yards away.
Although at the hearing Susan said the person was pudgy, his hair was closely cropped, he had a rounded face, and very dark eyes, in her initial statement to Hewlett, she simply described the person as a Hispanic male.
At the close of the hearing, the court said, "Had the victims been able to give a more detailed description of the individual other than short, pudgy Mexican, had the police inquired, had there been a show-up, line-up, anything that the police had done correctly it might be a different story but I must suppress the, the identification since that was not done correctly. I also note that Mr. Sullivan misidentified the riffle [sic] and he indicated that his attention was really more on the riffle [sic] than the person holding the riffle [sic] and he did misidentify the riffle [sic]."
"A trial court's ruling on a motion to suppress is clothed with a presumption of correctness on appeal, and the reviewing court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." State v. Manuel, 796 So.2d 602, 604 (Fla. 4th DCA 2001). When a ruling on a motion to suppress involves a mixed question of law and fact, as here, the standard of review for the factual findings is whether they were supported by competent, substantial evidence, and the application of those facts to the law is reviewed de novo. Id.
A two-part test is applicable in determining whether to suppress an out-of-court identification: "(1) did the police employ an unnecessarily suggestive procedure in obtaining an out-of-court identification; (2) if so, considering all the circumstances, did the suggestive procedure give rise to a substantial likelihood of irreparable misidentification." Grant v. State, 390 So.2d 341, 343 (Fla.1980).
The factors to be considered in evaluating the likelihood of misidentification include the opportunity of a witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness *832 at the confrontation, and the length of time between the crime and the confrontation.
Id. (quoting Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).
An in-court identification may be excluded "when the police have obtained a pretrial identification by means of an unnecessarily suggestive procedure." Edwards v. State, 538 So.2d 440, 442 (Fla. 1989) (citations omitted). "[T]he in-court identification may not be admitted unless it is found to be reliable and based solely upon the witness' independent recollection of the offender at the time of the crime, uninfluenced by the intervening illegal confrontation." Id. (citations omitted).
In gauging the reliability of an in-court identification, the trial judge must consider the following factors: the prior opportunity the witness had to observe the alleged criminal act; the existence of any discrepancy between any pretrial lineup description and the defendant's actual description; any identification prior to the lineup of another person; any identification by picture of the defendant prior to the line-up; failure to identify the defendant on a prior occasion; any time lapse between the alleged act and the lineup identification; and any other factors raised by the totality of the circumstances that bear upon the likelihood that the witness' in-court identification is not tainted by the illegal lineup.
Id. at 443 (citation omitted) (noting the factors are substantially the same as the Neil factors). The state must overcome a presumption that the in-court identification is tainted and unreliable as a result of improper out-of-court identification. See Id. at 444; Mendez, 423 So.2d at 622.
Extrapolating the requirement of state action for a search or seizure to be constitutionally unreasonable, the state argues that there was no unnecessarily suggestive procedure here because the Sullivans' looking at Gomez's picture did not constitute state action. In State v. Iaccarino, 767 So.2d 470, 475 (Fla. 2d DCA 2000)(citing United States v. Cleaveland, 38 F.3d 1092, 1093 (9th Cir.1994)), the court stated, "To determine whether a private individual acts as an instrument of the state, courts look to (1) whether the government was aware of and acquiesced in the conduct; and (2) whether the individual intended to assist the police or further his own ends."
Although there was no direct evidence that the sheriff's deputies intended the Sullivans to view Gomez's picture, it is clear that the investigating detective and other deputies or county jail employees had communicated Gomez's name to the Sullivans in advance of their identification. As there is no contention that the state agents were not aware that Gomez's photo was available on the public website, the trial court could certainly conclude that the communication of Gomez's name was the equivalent of encouraging or acquiescing in the Sullivans' conduct. There is no explanation why Hewlett did not conduct a line-up or photo line-up prior to furnishing the name. Further, while there was testimony that Susan wanted to look at his picture to be assured of her safety, she also expressed concern that the wrong person may have been arrested. Therefore, it cannot be said that the Sullivans viewed the picture solely in furtherance of their own ends.
The record also reflects that, although the trial court was initially prepared to suppress based solely on the deputies' conduct in providing Gomez's name, the court ultimately applied the Neil factors and, finding that the identification was unreliable, ruled the state failed to establish that the witness' recollection was independent of the suggestive identification.
*833 On these facts, the trial court could properly conclude that it was unnecessarily suggestive for the victims to be provided the defendant's name and resulting access to his photo on the website before having any opportunity to identify him, thus giving rise to a substantial likelihood of irreparable misidentification. See generally Fitzpatrick v. State, 900 So.2d 495, 518 (Fla.2005)(quoting Washington v. State, 653 So.2d 362, 365 (Fla.1994)) (holding "showing of a single photo [i]s unduly suggestive"); Johnson v. State, 566 So.2d 888, 890 (Fla. 4th DCA 1990) (finding police officer asking witness if he could pick out appellant's picture and telling witness appellant was in custody unduly suggestive).
Given the totality of the circumstances and the presumption of correctness of the trial court's factual findings, we cannot conclude that the court abused its discretion in determining there was a substantial likelihood of irreparable misidentification and in excluding both the pre-trial and in-court identifications. The Sullivans only saw Gomez for a brief time at dusk, during which they were, in part, focused on the rifle. This was compounded by the length of time between the crime and when the Sullivans saw the picture. Further, there was a discrepancy between Susan's first description of Gomez as a "Hispanic" male and her detailed testimony at the hearing, after she had seen the picture. The trial court could conclude that these considerations outweigh the testimony as to the Sullivans' level of certainty of identification upon seeing the website picture at least two weeks after the incident.
Therefore, the petition is denied.
POLEN and FARMER, JJ., concur.