991 So.2d 411 (2008)
The STATE of Florida, Petitioner,
v.
Tremayne PARKER, Respondent.
No. 3D08-450.
District Court of Appeal of Florida, Third District.
September 24, 2008.
Rehearing Denied October 2, 2008.
*412 Katherine Fernandez Rundle, State Attorney, and Penny H. Brill, Assistant State Attorney; Bill McCollum, Attorney General, for petitioner.
Bennett H. Brummer, Public Defender, and Maria E. Lauredo, Assistant Public Defender, for respondent.
Before SUAREZ, ROTHENBERG, and LAGOA, JJ.
ROTHENBERG, Judge.
The State of Florida ("the State") seeks a writ of certiorari quashing the trial court's orders granting the defendant's motion to suppress the out-of-court and in-court identifications, and an order granting the defendant's motion in limine regarding his involvement in drugs. For the reasons that follow, we grant the petition in part, quash the trial court's orders suppressing the out-of-court and in-court identifications, and deny the petition to quash the order granting the defendant's motion in limine.
We have jurisdiction pursuant to Article V, section 4(b)(3) of the Florida Constitution, and Florida Rules of Appellate Procedure 9.030(b)(3) and 9.100. See State v. Pettis, 520 So.2d 250 (Fla.1988) (upholding State's right to certiorari review of pretrial orders); State v. Rambaran, 975 So.2d 519 (Fla. 3d DCA 2008) (holding that orders suppressing relevant evidence may be reviewed by petition for writ of certiorari); State v. Styles, 962 So.2d 1031 (Fla. 3d DCA 2007) (finding certiorari review appropriate for suppression of out-of-court and in-court identifications); State v. Gerry, 855 So.2d 157 (Fla. 5th DCA 2003).
The defendant was indicted for the first-degree premeditated murder of Andre Hart ("the victim") and possession of a firearm by a convicted felon. The firearm charge was severed for trial. The State contends that the defendant shot and killed the victim at approximately 5:10 a.m. outside of the victim's mother's home where he had been living with his girlfriend, Venecia Anderson ("Ms. Anderson"), and their four-month-old daughter.
Ms. Anderson, in a sworn statement taken just hours after the shooting, testified that she was awakened by the sound of gunfire. When she looked out of a window, she saw a man who she knew as *413 "Tremayne," getting into the front passenger seat of a black four-door 1995 or 1996 Nissan Maxima with dark black tinted windows. She additionally noted that the vehicle Tremayne entered was parked in front of the victim's vehicle, and after the shooting, the vehicle proceeded east and turned left on 23rd Avenue in the direction of 68th Street.
Ms. Anderson found the victim lying near his car, covered in blood and unresponsive. She called 911 and the police arrived while she was still on the phone speaking with the operator. Ms. Anderson described the man she saw as a tall, skinny, very dark-skinned black man, with a short scruffy-looking beard and a low-cut Afro haircut, wearing a black crew-neck T-shirt. She testified that the lights in front of the house were "very bright," she actually made eye contact with the subject, she had known the subject since she was fifteen or sixteen years old, and she had seen him at least five or six times in the area of her sister's house prior to the shooting. Ms. Anderson explained that her sister lived at 1943 N.W. 2nd Court and she had seen Tremayne near her sister's apartment on a number of occasions when she dropped her baby off at her sister's apartment.
In this sworn statement, Ms. Anderson told Detective Rivers that the victim was afraid of Tremayne, and that when Tremayne learned where they were living, they moved from their apartment into the victim's mother's home. She explained that approximately three years earlier, Tremayne killed the victim's friend, Kawanis Hammette, and although Tremayne was arrested for the killing of Hammette, he was not ultimately prosecuted for the crime. The victim, however, was prosecuted for tampering with evidence related to the shooting of Hammette, which resulted in a violation of his probation and a sentence of ten months incarceration.
In her sworn statement, Ms. Anderson stated that since the death of Hammette, there had been bad blood between the victim and Tremayne. She described an incident she witnessed wherein Tremayne threatened the victim. She testified that she was with the victim and their daughter. When Tremayne saw them, he formed his hand to simulate a gun, and pretended to shoot at the victim. Ms. Anderson testified that the victim told her that Tremayne threatened him daily, he was aware that Tremayne carried a gun, and he was afraid of Tremayne. Ms. Anderson positively identified the defendant in a live line-up as the man she saw getting into the black Nissan Maxima the night the victim was shot.
Ms. Anderson's testimony at the motion to suppress was consistent with the sworn statement she provided to the police on the morning of the homicide. At the motion to suppress, the trial court also learned the following. While still at the scene of the crime, and before Ms. Anderson spoke to Detective Rivers, Ms. Anderson told Detective Melgarejo and a friend or family member, Yolanda Clemens, that she knew the individual she saw outside her home when the victim was killed, and his name was Tremayne. During the ride to the homicide office, prior to Ms. Anderson's interview by Detective Rivers and her sworn statement, Ms. Clemens told Detective Rivers that Ms. Anderson had called her and told her that she recognized the person as someone she knew.
While still at the scene of the homicide, and prior to Ms. Anderson's sworn statement, law enforcement learned that the "Tremayne" Ms. Anderson was referring to was Tremayne Parker, the defendant. Law enforcement apparently obtained this *414 information from Aaron Stirrup, the victim's brother.
Based upon the information Detective Rivers had obtained, he assembled two photographic line-ups and showed them to Ms. Anderson at the homicide office. Ms. Anderson did not identify the defendant, whose picture was contained in one of the photo arrays. She did, however, select the picture of Larry Duggins as someone who looked like Tremayne Parker, and told Detective Rivers that she would like to view a live line-up because she could identify the man she saw on the night of the shooting if she observed him in a live line-up.
Because the defendant had not yet been arrested and was not in custody, a court order had to be obtained to subject the defendant to a live line-up. Unfortunately, before the live line-up could be arranged, the victim's brother, Aaron Stirrup, showed Ms. Anderson a picture of the defendant. At the live line-up, Ms. Anderson immediately and positively identified the defendant as the man she saw that night, who she knew as Tremayne, a man she had seen on a number of occasions prior to the shooting and who she had seen threaten the victim prior to the victim's murder.
Based upon the suggestiveness of Ms. Anderson being shown a picture of the defendant by the victim's brother prior to Ms. Anderson's positive identification of the defendant at the line-up, the trial court suppressed Ms. Anderson's pre-trial identification and her in-court identification at the upcoming trial.

LEGAL ANALYSIS
"Florida law is clear that there is a two-part test for the suppression of an out-of-court identification." Styles, 962 So.2d at 1032; see also Grant v. State, 390 So.2d 341, 343 (Fla.1980) (adopting the two-part test established by the United States Supreme Court in Manson v. Brathwaite, 432 U.S. 98, 110, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). The trial court must first determine if the procedure employed by the police in obtaining the out-of-court identification was unnecessarily suggestive. Upon a finding that the procedure employed by the police was unnecessarily suggestive, the trial court must examine the totality of the circumstances to determine whether "the suggestive procedure [gave] rise to a substantial likelihood of irreparable misidentification." Thomas v. State, 748 So.2d 970, 981 (Fla.1999). When examining the totality of the circumstances, the trial court must consider:
(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.
Grant, 390 So.2d at 343 (citing Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).
The State argues that because the two-part test for the suppression of an out-of-court identification in Florida requires a finding that the identification procedure employed by law enforcement was unnecessarily suggestive, and it is undisputed that the procedure employed by law enforcement in the instant case was not suggestive, the trial court erred in suppressing the identification.
We begin our analysis by noting that even if we were to find that the identification procedure employed by law enforcement was unnecessarily suggestive in the instant case, we would be required to grant the State's petition, as the trial court failed to perform the two-part test in determining *415 whether, under the totality of the circumstances, the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. It is, however, undisputed, that in the instant case, neither the law enforcement officers nor the State employed a suggestive procedure in the identification of the defendant. It is also undisputed that when the police conducted the live line-up, they were completely unaware that the victim's brother had shown Ms. Anderson a picture of the defendant.
Thus, the question we must resolve in this appeal is whether a private citizen, who acts on his own without the assistance or encouragement of the State or its agents, converts private action into state action by employing a suggestive procedure in the identification process. In other words, whether the exclusionary rule applies to identification procedures absent state action.
Because this is an issue of first impression in this jurisdiction, we begin our analysis with a review of the information and the application by the United States Supreme Court of the exclusionary rule, which was devised to protect constitutional interests. In the Fourth Amendment context, the exclusionary rule applies to evidence obtained by illegal police or prosecutorial actions, regardless of whether the evidence obtained is reliable or unreliable, because the purpose of the rule in the Fourth Amendment context is to deter illegal state action. See e.g., Illinois v. Krull, 480 U.S. 340, 353, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987); United States v. Leon, 468 U.S. 897, 916, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); Stone v. Powell, 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). However, "[b]ecause the exclusionary rule in respect to Fourth Amendment violations is based upon the deterrence of illegal police or prosecutorial action, it is not triggered by the actions of private persons however egregious they may be." State v. Pailon, 590 A.2d 858, 861 (R.I.1991) (emphasis added) (citing United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); Walter v. United States, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921)). Thus, in the Fourth Amendment context, the exclusionary rule only applies to state action.
In 1966, the United States Supreme Court extended the exclusionary rule applied in the Fourth Amendment context (to protect citizens from illegal searches or seizures by law enforcement or the State), to also protect against the erosion of the Fifth Amendment privilege against self-incrimination during custodial interrogations by law enforcement. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
The Fourth and Fifth Amendments are applicable to the states by way of the Due Process Clause of the Fourteenth Amendment. A violation of the Due Process Clause of the Fourteenth Amendment, however, does not require suppression of the evidence seized under the exclusionary rule absent state action. In applying a due process analysis to the confession by the defendant, in Colorado v. Connelly, 479 U.S. 157, 165-67, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), Chief Justice Rehnquist specifically noted that the law was well-settled, and to support a violation of the Due Process Clause of the Fourteenth Amendment, state action was required and the exclusionary rule does not apply absent police conduct. In rejecting the Supreme Court of Colorado's conclusion that state action was not required, *416 Chief Justice Rehnquist noted that:
The difficulty with the approach of the Supreme Court of Colorado is that it fails to recognize the essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other. The flaw in respondent's constitutional argument is that it would expand our previous line of "voluntariness" cases into a far-ranging requirement that courts must divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision.
Id. at 165-66, 107 S.Ct. 515.
The exclusionary rule was extended to identification procedures in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). The Wade and Gilbert decisions prohibited eyewitness identification testimony that was tainted by law enforcement's failure to protect the subject's Sixth Amendment right to counsel at this critical stage of the prosecution. Eyewitness identifications obtained without notifying the subject's counsel or providing the subject with the opportunity to obtain counsel at a line-up, post indictment, were excluded. However, in Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the United States Supreme Court narrowed or clarified its position, holding that a showup conducted immediately after an arrest was not subject to the right to counsel because an adversarial judicial proceeding had not yet commenced, and therefore, the right to counsel had not attached.
In the cases that followed, regardless of whether the analysis focused on due process concerns or the right to counsel, the conduct examined was governmental rather than private. Although the United States Supreme Court has not yet considered the effect of private action upon due process in identification procedures, it is reasonable to conclude that the Court's position will conform with its position regarding confessions.
With respect to confessions, Chief Justice Rehnquist in Connelly rejected a challenge to nonprosecutorial-influenced confessions, recognizing that to suppress a defendant's statement, absent state action, would serve no purpose in enforcing constitutional guarantees. To exclude relevant evidence without state misconduct would, in Justice Rehnquist's opinion, create an entirely new constitutional right. Connelly, 479 U.S. at 166, 107 S.Ct. 515.
We have been unable to find, and the defendant does not cite to, any Florida case, in which a pretrial identification or an in-court identification was suppressed on constitutional grounds absent improper or overly suggestive State action.[1] That is *417 because "absent state action, no constitutional violation that would give rise to the creation of an exclusionary rule has been committed." Pailon, 590 A.2d at 863. Absent state action, the reliability of the identification may be considered by the jury, and the defendant is afforded an opportunity, through cross-examination, to expose a witness' lack of credibility or a flaw in the identification procedure. Moreover, the State is required to prove beyond a reasonable doubt the identity of the accused, and the jury must reach a unanimous verdict as to the defendant's guilt.
We, therefore, conclude that United States and Florida law do not require application of the exclusionary rule in the admission of identification evidence absent state action. Because the defendant does not allege any improper or suggestive conduct on the part of the State or law enforcement, the two-part analysis in determining whether, under all of the circumstances, the suggestive conduct gives rise to the substantial likelihood of an irreparable misidentification is not required in the instant case.
Petition granted; order quashed.
NOTES
[1] In Neil, 409 U.S. at 199-200, 93 S.Ct. 375, the Court examined an identification of the defendant at the police station. This identification was made by presenting only the defendant to the victim at the police station after the victim had failed to identify the perpetrator by viewing several photographic line-ups and live show-ups over a seven-month period of time. While the Court concluded that the identification procedure employed by law enforcement was suggestive, it found that under the totality of the circumstances, the victim's identification of the defendant was reliable and it was properly allowed to go to the jury. See also Manson, 432 U.S. at 98-99, 97 S.Ct. 2243 (examining the introduction of an identification where only one picture was shown to the victim by a police officer and rejecting per se suppression of identification evidence where unnecessarily suggestive procedures are employed by law enforcement); Simmons v. State, 934 So.2d 1100, 1118-20 (Fla.2006) (finding that the methods employed by law enforcement were highly suggestive, thus satisfying the first prong of the out-of-court identification analysis, but after considering the second prong whether under the totality of the circumstances, the procedures gave rise to a substantial likelihood of irreparable misidentificationconcluded that the trial court did not err in admitting the identification evidence); Grant, 390 So.2d at 344 (holding that the Court need not address the second prong of the analysis where the police were unaware that the witness had seen a photo array, containing a picture of the defendant, that was being observed by another witness in a separate investigation when she appeared at the police station to view a live line-up, and there was no evidence to suggest that the live line-up was conducted in an improper or suggestive manner); Styles, 962 So.2d at 1033 (holding that "if the police did not use an unnecessarily suggestive procedure, then the court need not consider the second part of the test") (quoting Thomas, 748 So.2d at 981); State v. Gomez, 937 So.2d 828 (Fla. 4th DCA 2006) (holding that "[a]n in-court identification may be excluded `when the police have obtained a pretrial identification by means of an unnecessarily suggestive procedure'") (quoting Edwards v. State, 538 So.2d 440, 442 (Fla. 1989)).