STATE

v.

Daron PAILON.

No. 90–152–C.A.

Supreme Court of Rhode Island.

April 30, 1991.

James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., Jane McSoley, Sp. Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on the defendant's appeal from a judgment of convic-

tion of robbery entered in the Superior Court. We affirm. The facts of the case insofar as pertinent to this appeal are as follows.

On January 27, 1987, between 1:30 and 2 p.m., Sharon Voller was in a retail jewelry store owned by her and operated under the name Designer Jewelry. Paul Jestings was also present in the store, engaged in electrical repair work. Two men entered the store, and one of them inquired about the purchase of a wedding band and an engagement ring. After some discussion about price range, Voller informed the man that she had nothing within his price limit of $500. He responded that he would come back later after he received an expected check from the government. The two men spent a total of about five to ten minutes in the store. The man who inquired about the ring identified himself as Charlie Edwards. The second man also asked about the price of a gold chain. Both men left the store without incident.

That same afternoon, somewhere between 4:30 and 5 p.m., Voller was alone in the store and engaged in a telephone conversation with her sister-in-law. The man who had been the companion of the person who identified himself as Charlie Edwards entered the store. This man was later identified as Daron Pailon, defendant. Voller signaled defendant to wait, indicating that she would be right with him. Because she was somewhat anxious, Voller left the telephone off the hook so that her sister-in-law might hear the exchange between her and defendant and then went to wait on him. He asked to see a gold chain. When Voller opened the showcase in order to present the chain for inspection, defendant grabbed her dress and jumped over the showcase. He then placed his hand over her mouth and forced her into a back room. As she passed the showcase, Voller screamed. Upon entering the back room, defendant threw Voller on the floor, took out a gun, and pointed it at her, holding it close to her mouth and saying "[Y]ou saw me, you bitch, you saw me." He momentarily left her and then took her into the bathroom. There he struck her repeatedly in the face and head with such force that at

one point her head was driven through the bathroom wall.

After the beating, defendant ordered Voller to open the safe. She replied that it was already open. He took the contents, which consisted of about $500 in cash and her partner's gun. He then dragged her back to the front portion of the store and ordered her to open the showcase. He told her next that he needed a bag, and Voller went to the rear of the store to obtain one. On her way she pressed a silent alarm affixed to her desk. The defendant joined her in the rear of the store, took a money bag lying on the floor, and seized Voller's purse. The defendant finally ordered her to go into the back room, and she complied. Before entering the back room, she noticed the other man who had entered the store earlier and inquired about the ring—he was outside the store, walking back and forth.

A minute or two after she had gone into the back room, Voller heard the door open. She asked who was there but received no reply. She came to the front of the store and saw that the robber had left. Shortly thereafter, detectives of the Newport police department arrived. She was taken to the Newport Hospital where she received treatment for her injuries. She later determined that the robber had taken jewelry valued at approximately $25,000 in wholesale value and $45,000 in retail value.

Voller, experiencing considerable pain and discomfort from her injuries, was given a prescription for Valium. She gave a general description of her assailant as a clean-cut black man with a light mustache, in his late twenties, who weighed approximately 140 pounds, and wearing dark dungarees and a sweatshirt. The day after the robbery, Voller went to the Newport police station in order to give a statement. At that time she was shown a photographic array (consisting of thirty to thirty-five photos) that included a photograph of Daron Pailon. She was unable to make a positive identification but later testified that she not only was very upset and nervous but was also under the effects of the Valium.

About four weeks later, on February 26, 1987, a man who identified himself as Derek Anderson came into her store and told her that the two individuals who had participated in the robbery were Daron Pailon and a man called Bo Bo Perryman. Anderson told her that the same two men had robbed his mother several years before. Voller told Anderson that she needed more information. Several days later Anderson called Voller and told her that he could direct her to a certain location where she would find a woman wearing some of the jewelry stolen in the robbery. She did not act upon this information. The day after the phone call Anderson again came to Voller's store. This time he showed her a photograph. Upon viewing the photograph, Voller instantly recognized the person who had assaulted and robbed her. Voller gave the photograph to a security guard employed at her store, who turned it over to the Newport police. No further activity took place on the case until June 1987.

At that time she received a summons from the Newport police to view a lineup at the station. She viewed the participants in the lineup for five to ten minutes and then selected defendant as her assailant. She later testified that she recognized defendant instantly but considered very carefully before identifying him to the police. At trial defendant's mother testified on his behalf and stated that he had worn a goatee since he was eighteen years old and was never clean shaven. She also testified that at the time of the alleged robbery, defendant weighed from 170 to 175 pounds.

In support of his appeal, defendant raises four issues. These issues will be considered in the order in which they were presented in defendant's brief. Additional facts will be furnished as required to deal with these issues.

I

THE MOTION TO SUPPRESS THE
IN-COURT IDENTIFICATION

■ The defendant argues that the eyewitness-identification testimony of Sharon Voller should not have been admitted into evidence because it was tainted not by any police or prosecutorial action but as a result of the suggestions made by Derek Anderson and the photograph he displayed to Voller after the robbery. It is important to note that the trial justice specifically found during the course of a preliminary hearing that a lineup conducted by the Newport police on June 4, 1987, was the fairest lineup in terms of the similarity of appearance of all persons included therein that the judge had seen in his fifteen years on the bench. The trial justice also found that Voller's in-court identification of defendant was reliable and based upon her recollection of her encounter with defendant "completely independent of the pre-trial procedures" including both the photograph presented by Anderson and the lineup conducted by the Newport police on June 4, 1987. This finding would insulate the identification testimony from any exclusionary rule promulgated by the Supreme Court of the United States, even if a pretrial procedure was unnecessarily suggestive as in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Camirand*, 572 A.2d 290 (R.I. 1990); *State v. Taylor*, 562 A.2d 445 (R.I. 1989); *State v. Nicoletti*, 471 A.2d 613 (R.I. 1984).

■ Nevertheless, since this case presents an issue of first impression in this jurisdiction, we believe that some analysis of the question of suggestive procedures by private persons and their effect upon admissibility of otherwise relevant evidence should be undertaken. This analysis will require a review of the formation and application by the Supreme Court of exclusionary rules that have been fashioned to protect constitutional interests. There seems little doubt that the Court's exclusionary rule relating to evidence obtained in violation of the Fourth Amendment was directed entirely at the deterrence of illegal police procedures, whether the evidence illegally obtained was reliable or unreliable. *See, e.g., Illinois v. Krull*, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987); *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Stone v.*

*Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Because the exclusionary rule in respect to Fourth Amendment violations is based upon the deterrence of illegal police or prosecutorial actions, it is not triggered by the actions of private persons however egregious they may be. *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). Such activities would withstand not only Fourth Amendment but due-process analysis as well. *See Colorado v. Connelly,* 479 U.S. 157, 166, 107 S.Ct. 515, 521, 93 L.Ed.2d 473, 483 (1986).

A similar prophylactic rule was fashioned by the Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), designed to protect the Fifth Amendment privilege against self-incrimination from dilution or erosion as a result of in-custodial interrogation by the police or law-enforcement authorities. This prophylatic rule was determined by the Court, after a due-process analysis, to be inapplicable in a situation in which, without any prosecutorial or police intervention, a defendant who suffered from chronic schizophrenia confessed to a murder because of prompting by "the voice of God." *Colorado v. Connelly,* 479 U.S. at 166, 107 S.Ct. at 518, 93 L.Ed.2d at 480. In that case Chief Justice Rehnquist, writing for a majority of the Court, enunciated the principle that in the Fifth Amendment area, as made applicable to the states by the conduit of the due-process clause of the Fourteenth Amendment, the exclusionary rule should not apply absent police conduct causally related to the confession. The Chief Justice's comment on this issue is instructive:

> "Our 'involuntary confession' jurisprudence is entirely consistent with the settled law requiring some sort of 'state action' to support a claim of violation of the Due Process Clause of the Fourteenth Amendment. The Colorado trial court, of course, found that the police committed no wrongful acts, and that finding has been neither challenged by respondent nor disturbed by the Supreme Court of Colorado. The latter court, however, concluded that sufficient state action was present by virtue of the admission of the confession into evidence in a court of the State. 702 P.2d [722], at 728–729.

> "The difficulty with the approach of the Supreme Court of Colorado is that it fails to recognize the essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other. The flaw in respondent's constitutional argument is that it would expand our previous line of 'voluntariness' cases into a far-ranging requirement that courts must divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision." 479 U.S. at 165–66, 107 S.Ct. at 521, 93 L.Ed.2d at 483.

■ The foregoing comment strongly supports the proposition that a violation of due process can occur only if state action is involved. This state action cannot be supplied simply by admitting the alleged involuntary confession into evidence. We regard this principle as being applicable and, indeed, dispositive of the issue before us.

Nevertheless, *before we conclude our analysis,* let us consider the history of the exclusionary rule devised by the Supreme Court of the United States in respect to identification procedures. The first such exclusionary rule was created in the cases of *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). These two cases were written as part of a trilogy of cases authored by Justice Brennan in conjunction with a third case, *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). In *Stovall,* Justice Brennan described these exclusionary rules in the following manner. "*Wade* and *Gilbert* fashion exclusionary rules to deter law enforcement authorities from exhibiting an accused to witnesses before trial for identi-

fication purposes without notice to and in the absence of counsel." *Id.* at 297, 87 S.Ct. at 1970, 18 L.Ed.2d at 1203–04. Essentially *Wade* and *Gilbert* prohibited the introduction of eyewitness-identification testimony that had been tainted by official pretrial procedures without notice to counsel or the opportunity to obtain counsel to be present at the lineup in respect to post-indictment procedures. This rule was designed not only to deter unfairness at such identification procedures but also to protect the Sixth Amendment right to counsel at a critical stage of the prosecutorial effort. Although Justice Brennan's language was broad enough to apply to any pretrial confrontation, the court retreated from this perceived position in the case of *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), when a plurality held (over Justice Brennan's dissent) that this Sixth Amendment right to counsel and its accompanying exclusionary rule would be applicable only after the commencement of adversarial judicial proceedings. The Court held in *Kirby* that a showup conducted immediately after arrest was not subject to the right to counsel enunciated in *Wade* and *Gilbert* because adversarial judicial proceedings had not commenced and, therefore, the right to counsel had not attached.

A parallel doctrine based upon due process was also enunciated in *Stovall*, wherein the Court decided that the *Wade* and *Gilbert* exclusionary rules would not be retroactive but that a confrontation for identification (a one-person showup to a hospitalized victim) would be subject to attack if the confrontation "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the suspect] was denied due process of law." 388 U.S. at 302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206. The Court held in *Stovall* that the presentation of Stovall to the wounded victim, though suggestive, was a necessary and imperative requirement because of the totality of circumstances including the possibility that the victim might expire at any moment. This same type of analysis was suggested for photographic arrays in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), wherein

the right to counsel was not applicable and a photographic display was under consideration. The due-process analysis was again utilized in the lineup case of *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). This case involved a pre-*Wade* lineup in which, under the totality of circumstances, the Court, through Justice Fortas following the *Stovall* principle, held that the suggestive elements in a three-man lineup conducted by law-enforcement officers made it all but inevitable that the victim would identify the suspect whether or not he was in fact the perpetrator. The Court held that this procedure so undermined the reliability of the eyewitness identification as to violate due process.

It should be noted that in all the foregoing cases the offending conduct, whether violative of the right to counsel or due process, was carried out by governmental rather than private action.

The Supreme Court of the United States has never had occasion to consider the effect of private action upon due process in an identification context. However, we are of the opinion that the analysis given by Chief Justice Rehnquist in *Colorado v. Connelly, supra,* considering the admissibility of a confession but applying due-process principles, would be so analogous as to be dispositive of this issue. In respect to the nonprosecutorial-influenced confession, the Chief Justice rejected a challenge based upon lack of voluntariness and, in doing so, observed that suppressing the defendant's statements would serve absolutely no purpose in enforcing constitutional guarantees and said further that to exclude such evidence would require the establishment of a brand new constitutional right. In commenting upon the wisdom of the establishment of such a right, the Chief Justice gave the following admonition:

"We have previously cautioned against expanding 'currently applicable exclusionary rules by erecting additional barriers to placing truthful and probative evidence before state juries * * *.' *Lego v. Twomey*, 404 U.S. 477, 488–489 (1972). We abide by that counsel now. '[T]he

central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence,' *Delaware v. Van Arsdall,* 475 U.S. 673 (1986), and while we have previously held that exclusion of evidence may be necessary to protect constitutional guarantees, both the necessity for the collateral inquiry and the exclusion of evidence deflect a criminal trial from its basic purpose. Respondent would now have us require sweeping inquiries into the state of mind of a criminal defendant who has confessed, inquiries quite divorced from any coercion brought to bear on the defendant by the State. We think the Constitution rightly leaves this sort of inquiry to be resolved by state laws governing the admission of evidence and erects no standard of its own in this area. A statement rendered by one in the condition of respondent might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum, *see, e.g.,* Fed.Rule Evid. 601, and not by the Due Process Clause of the Fourteenth Amendment. 'The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false.' *Lisenba v. California,* 314 U.S. 219, 236 (1941).

"We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment. We also conclude that the taking of respondent's statements, and their admission into evidence, constitute no violation of that Clause." *Colorado v. Connelly,* 479 U.S. at 166–67, 107 S.Ct. at 521–22, 93 L.Ed.2d at 484.

Applying these principles to the case at bar, we conclude that absent state action, no constitutional violation that would give rise to the creation of an exclusionary rule has been committed. This does not mean, of course, that the trial justice was incorrect in conducting a preliminary hearing

that was within the exercise of his discretion, *see People v. Blackman,* 110 A.D.2d 596, 488 N.Y.S.2d 395 (1985), even though such private action might not have required such a preliminary hearing. It is conceivable that identification evidence might become so unreliable as to fall below the threshold of competence. R.I.R.Evid. 601. This indeed would be a rare occurrence and would involve the question of lack of personal knowledge as set forth in Rule 602.

Probably the best guarantee of due process in such a situation as that presented by the case at bar would be the opportunity for cross-examination in order to expose a witness's lack of credibility. This opportunity is further buttressed and enforced by the requirement that the state prove every element of the crime, including the identity of the accused beyond a reasonable doubt. The guarantee is also supported not only by the requirement of a unanimous jury verdict but also by the power of the trial justice to review the evidence, including credibility, on a motion for new trial.

Thus, the due-process rights of defendant in this case, as in all criminal cases, are adequately protected from violations of due process without the fashioning of additional exclusionary rules, whether pursuant to the Federal or the Rhode Island Constitution.

Consequently the trial justice did not err in declining to suppress the eyewitness identification of Sharon Voller.

II

## THE WAIVER OF A JURY OF TWELVE

■ The defendant argues that the trial justice erred in accepting the waiver by defendant and his counsel of his right to have his case decided by a jury of twelve persons. The facts underlying this waiver were as follows.

During the voir dire examination of the jurors, counsel had questioned the prospective panel members concerning whether anyone had been the victim of a similar crime in the past. One of the jurors re-

sponded that his brother had been involved as a victim of a crime but did not mention that he himself had been such a victim. No alternate jurors had been impaneled owing to the limited numbers of jurors available in Washington County and also in light of the fact that another trial justice was engaged in a jury trial in another courtroom.

About midway through the trial this juror recalled and informed the court that he had been the victim of an armed robbery about five to eight years prior to the trial. He stated that he had been robbed at knife point while working alone at a gas station. The juror stated that he did not recall the incident during voir dire examination. He also assured the court that this incident would not in any way affect his impartiality and asserted that he felt he could continue to sit as a juror and render a verdict based upon the evidence. The juror, Lee Kissinger, further disclosed that he was an engineer and was accustomed to dealing with facts in the course of his employment. He further stated that his experience would not cause him to be more or less favorable to either party. Counsel for defendant did not question the juror, nor did counsel for the state. After the trial justice had concluded his questioning of the juror, counsel for defendant conferred with his client and stated that if the juror had made this disclosure during the voir dire, he would have exercised a peremptory challenge. Defense counsel then discussed with his client whether he wished to move for a mistrial or whether he wished to "challenge this" (probably meaning the juror). After the discussion, defense counsel requested the court to excuse the juror and to allow the case to proceed with the eleven remaining jurors.

The state agreed to the proposal of defense counsel. The trial justice stated that he felt that the juror could be impartial notwithstanding the incident that he recalled but observed that under Rule 23 of the Superior Court Rules of Criminal Procedure, the parties might stipulate with the approval of the court that the jury should consist of any number less than twelve. The trial justice then had defendant take the stand, and after having the oath administered, he admonished defendant concerning his right to a jury of twelve. The defendant asserted that he understood but further stated that he agreed to waive his right to a jury of twelve and wished to proceed with a jury of eleven from which Kissinger would be excused.

The defendant's claim of error is based upon the argument that although the court admonished defendant concerning his right to a jury of twelve, he failed to admonish defendant that he also had a right to challenge the juror for cause and then, having achieved the court's approval of the challenge, he could seek a mistrial.

The difficulty with this argument is that any such admonition would have been both incorrect and misleading. There is no indication that the court would have acceded to a challenge for cause. No such challenge was presented, but the trial justice's comments indicate that he thought the juror would still be impartial. Consequently there was little likelihood that the mistrial option would have been available. The trial justice was given a proposal by counsel to excuse a juror whom counsel might have peremptorily challenged in the voir dire if he had known about the prior incident. The state agreed to the proposal, and defendant, after consultation with counsel, also agreed.

In our opinion, this was a voluntary and intentional waiver of a known right. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Consequently the judge committed no error in accepting this waiver after admonishing defendant concerning all but highly speculative factors.

### III

### LESSER INCLUDED OFFENSES

■ The defendant argues that the trial justice should have instructed the jury on the lesser included offenses of assault with intent to rob and assault with a dangerous weapon. We have stated that a defendant is entitled to a charge on a lesser included offense only when the evidence at trial warrants such an instruction. *State v.*

*Brown,* 549 A.2d 1373 (R.I.1988). In that case, we held that a defendant who had been charged with robbery was not entitled to instructions about a lesser included offense when the evidence disclosed no dispute concerning whether a robbery had been committed. *See State v. Austin,* 462 A.2d 359 (R.I.1983); *State v. Muir,* 432 A.2d 1173 (R.I.1981).

Similarly in the case at bar, there was no dispute that a robbery had taken place. The only issue raised by defendant in the course of the trial was that of identification. Sharon Voller testified that the robber had taken cash, a gun, and $25,000's worth of jewelry at wholesale value. There was no basis for any rational jury to reject this testimony. The fact that the jewelry was not recovered did not diminish the force and credibility of Voller's testimony. Therefore, there was no evidence in the case, direct or inferential, that would have justified a jury's finding that this defendant had committed a lesser included offense. The trial justice did not err in rejecting the request for such an instruction.

## IV

### THE PROSECUTOR'S OPENING REMARKS

■ In his opening statement, counsel for the state referred to the possibility that Sharon Voller would testify concerning her encounter with a person later found to be Derek Anderson. Defense counsel objected to this portion of the opening statement on the ground that Voller's testimony would include inadmissible hearsay. The trial justice sustained the objection and directed the prosecutor to confine his opening statement to matters relating to Voller's observations. No cautionary instruction was requested. In sustaining the objection made by defense counsel, the trial justice did everything that he was requested to do. Since counsel for the defendant did not ask for a cautionary instruction following the trial justice's ruling or at any other time, this issue has not been preserved for appellate review. *State v. La-Pointe,* 525 A.2d 913 (R.I.1987).

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment of conviction entered in the Superior Court is affirmed. The papers in the case may be remanded to the Superior Court.