******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* NATHAN S. JOHNSON
### (SC 19102)

Rogers, C. J., and Palmer, Zarella, McDonald, Espinosa and Vertefeuille, Js.

*Argued December 11, 2013—officially released July 29, 2014*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Eugene Calistro*, senior assistant state's attorney, for the appellee (state).

*Charles D. Ray* filed a brief for the Innocence Project as amicus curiae.

*Opinion*

VERTEFEUILLE, J. The primary issue that we must resolve in this appeal is whether the due process clauses of the Connecticut constitution provide protection against allegedly unduly suggestive eyewitness identification procedures undertaken by a private actor. The defendant, Nathan S. Johnson, was charged with various criminal offenses in connection with the shooting of the victim, Johnnie Jones. Before trial, the defendant filed a motion to suppress the victim's identification of him as the perpetrator on the ground that it was the result of unnecessarily suggestive police procedures. The trial court denied the motion. The jury ultimately returned a verdict of guilty on charges of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), robbery in the first degree in violation of General Statutes § 53a-134 (a) (1), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (1), and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 (a). The defendant also was found guilty by the court, *B. Fischer, J.*, of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1),[1] and the trial court thereafter rendered judgment of guilty in accordance with the verdict and the court's finding. The defendant appeals from the judgment of conviction claiming for the first time that the victim's conduct in identifying the defendant as the perpetrator was unduly suggestive and that unduly suggestive conduct by a private actor violates the due process provisions of the state constitution even in the absence of any improper state action.[2] We conclude that eyewitness identifications that are not tainted by any unduly suggestive state action do not implicate the due process provisions of the state constitution unless, as with any other form of evidence, the identification was so extremely unreliable that its admission deprived the defendant of his right to a fair trial.

The record reveals the following facts that are either undisputed or were expressly found by the trial court. On December 30, 2009, the victim, who was then twenty-seven years old, left his job at the Clarion Hotel on Whitney Avenue in New Haven at approximately 3:30 p.m., and took a bus to his residence at 50 Gilbert Street. After taking a nap, he left his residence and walked to a friend's house on Albert Street, a thirty to forty minute walk. Upon discovering that his friend was not at home, the victim walked to his father's house at 15 Adam Clayton Powell Place, a five to seven minute walk. He stayed there for approximately three to four hours, during which time he helped his father with his computer. He then went to the China Star restaurant on Dixwell Avenue, where he bought some cigarettes. As he was leaving the restaurant, he saw a group of men, including the defendant. The victim had seen the defendant before

when they had played "Pop Warner" football as teenagers and, more recently, in a store and in a bar in New Haven. The victim had exchanged handshakes with the defendant twice within the two months preceding December 30, 2009. The victim did not know the defendant's name. When the victim saw the defendant as he was leaving the China Star restaurant, they just looked at each other. The victim had no quarrel with the defendant.

After leaving the China Star restaurant, the victim went to a convenience store on Dixwell Avenue to get a light for his cigarettes and to purchase lottery tickets. As he was leaving the store, he saw some friends who asked him if he would like something to drink. The victim had two beers and two shots of gin. At some point, the victim's friends started smoking embalming fluid, and he decided to walk home. As he walked through the back of the plaza where the convenience store was located, two men jumped out and demanded his money. One of the men started patting him down and taking his belongings, including $5, a cell phone and keys. The person who was patting him down was wearing a purple "skully"—an "open-faced mask" that concealed only his hair and ears. He was also holding a dull silver revolver.

Although the lighting was dim, the victim was able to see the facial features of the person who was patting him down and to recognize him as the defendant. He was also able to see the complexion and the eyes of the other person, who was wearing a hat and a black scarf. The victim told the defendant that he knew him and asked him what he was doing. The defendant then said either "shoot that nigger," "shoot him," or "I'm gonna shoot him," at which point the victim ran. As he ran, he heard two shots and felt a burning sensation in his back. The victim then heard two more shots and fell to the ground.

After approximately fifteen minutes, the victim saw a man walking some dogs and he asked the man to call an ambulance. The man called 911 on his cell phone and put the phone on speaker mode so that the victim could talk to the dispatcher. The victim told the dispatcher that he had been assaulted by two African-American males but, when asked if he could identify his attackers, the victim responded that he could not. The victim testified at the suppression hearing that he denied having recognized the defendant because "[w]here I'm from you don't tell. You don't tell."

The victim was taken to Yale-New Haven Hospital, where he was interviewed by Craig Dixon, a detective with the New Haven Police Department (police department). The victim did not tell Dixon that he had recognized the defendant. Dixon interviewed the victim again on January 6, 2010, at which point the victim told Dixon that he had recognized one of the attackers as someone

with whom he had played Pop Warner football. The victim testified that he was willing to identify his assailant at that point because, before the interview, he had asked Dixon whether the police would have been able to find out who had shot him if he had died, and Dixon had responded, "no." The victim also testified that he had talked to his family, friends and physicians, who had urged him to tell the police if he knew who had robbed him.

At some point prior to February 20, 2009, the victim decided to search the Internet for photographs of the person who he believed had shot him. He found a photograph of that person and four other persons on the social networking site called My Space and printed out the page on which it was posted. On February 20, 2009, Dixon again visited the victim, who was then being treated at Gaylord Hospital in Wallingford, and the victim gave him the printout of the My Space page containing the photograph of the person he believed to be his assailant. Thereafter, Dixon logged into the My Space site with the police department's computer, located the page that the victim had printed and printed a larger color copy of the photograph. In addition, because Dixon had noticed that a comment, "Free my cousin Nate (#27),"[3] had been posted in the comment section of the My Space printout, he performed an "in-house check" of all males with the name Nate and Nathan.[4] He found a photograph of the defendant that resembled the person on the My Space printout.

Dixon then prepared a photographic array containing similarly sized and formatted photographs of eight young, African-American males wearing black shirts, including the defendant. On March 10, 2010, Dixon presented the photographic array to the victim, along with an instruction form indicating that the suspect's photograph might not be included, which Dixon read aloud to the victim and asked the victim to read to himself.[5] Dixon did not suggest that the victim pick any person out of the array, did not show the victim a separate photograph of the defendant, and did not suggest that a photograph of the victim's assailant was included in the array. The victim, without hesitation, identified the defendant from the array as the person who had shot him and with whom he had played Pop Warner football.

The defendant argued at the suppression hearing that the identification procedure was unduly suggestive because the photograph of the defendant that Dixon included in the photographic array was, according to defense counsel, the only photograph that looked similar to the person that the victim had identified as his assailant in the photograph from the My Space printout.[6] In addition, defense counsel argued that the victim's identification of the defendant was unreliable because the victim had been drinking prior to the time of the robbery, the lighting was "dim" at the time of the rob-

bery, the victim had not identified the defendant as his assailant immediately after the shooting, and the victim's descriptions of the shooter had varied. The trial court concluded that the police procedures had not been unduly suggestive and denied the defendant's motion to suppress. Thereafter, the defendant was tried and convicted of the previously set forth crimes. This appeal followed.[7]

On appeal, the defendant has effectively abandoned his claim that the photographic array was unduly suggestive. Instead, he claims for the first time that the victim's identification of the defendant as the shooter should have been suppressed because the *victim's* conduct was unduly suggestive. Specifically, the defendant claims that the identification should have been suppressed because the victim sought out a photograph of the defendant, studied it and had an opportunity to discuss it with friends and family before he gave the photograph to Dixon, and this process was unduly suggestive in the same manner that showing multiple photographs of a suspect to an eyewitness is unduly suggestive. See *State* v. *Randolph*, 284 Conn. 328, 386, 933 A.2d 1158 (2007) (identification procedure is unduly suggestive when "the eyewitness had been presented with multiple arrays in which the photograph of one suspect recurred repeatedly"); *State* v. *Holliman*, 214 Conn. 38, 46, 570 A.2d 680 (1990) (when private actor has engaged in unduly suggestive identification conduct, identification may be suppressed if defendant establishes that identification was unreliable). The defendant further claims that, although this court held in *Holliman* that the due process provisions of the federal constitution are not implicated when a private actor has engaged in unduly suggestive conduct; *State* v. *Holliman*, supra, 45; this court should hold that the due process clauses of the state constitution[8] are implicated when an identification is tainted by such conduct.[9]

Because the defendant's claim that unduly suggestive conduct by a private actor implicates the due process provisions of the state constitution is potentially dispositive, we first review that claim.[10] Although the claim was not preserved, because the record is adequate for review and the claim is of constitutional magnitude, it is reviewable pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[11] The scope of the rights protected by the due process clauses of our state constitution is a question of law over which our review is plenary. See *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 398 n.11, 941 A.2d 868 (2008).

We begin our analysis with a review of the existing law governing unduly suggestive identification procedures. "Due process requires that [eyewitness] identifications [may be admitted at trial] only if they are reliable and are not the product of unnecessarily suggestive

police procedures. *State v. Kemp*, [199 Conn. 473, 478, 507 A.2d 1387 (1986), overruled in part on other grounds by *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A. 3d 705 (2012)]. Because reliability is the linchpin in determining the admissibility of identification testimony; *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); a two part test has developed to make that determination. In . . . *State v. Marquez*, 291 Conn. 122, 141–42, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009), we noted the consensus with regard to the [following] overall analytical framework to be used in considering a claim of this sort: In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances. . . . *State v. Theriault*, [182 Conn. 366, 371–72, 438 A.2d 432 (1980)]; see also *Manson v. Brathwaite*, supra, [107] ([T]he first inquiry [is] whether the police used an impermissibly suggestive [identification] procedure . . . . If so, the second inquiry is whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification.); *United States v. DeCologero*, 530 F.3d 36, 62 (1st Cir.) (we first determine whether the identification procedure was impermissibly suggestive, and if it was, we then look to the totality of the circumstances to decide whether the identification was reliable), cert. denied, 555 U.S. 1005, 129 S. Ct. 513, 172 L. Ed. 2d 376, cert. denied, 555 U.S. 1039, 129 S. Ct. 615, 172 L. Ed. 2d 469 (2008). . . . This court concluded that [w]e continue to endorse and adhere to this widely utilized analytical approach. *State* v. *Marquez*, supra, 142." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Outing*, 298 Conn. 34, 47–48, 3 A.3d 1 (2010), cert. denied,     U.S.    , 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011).

In *State* v. *Holliman*, supra, 214 Conn. 45–46, this court held that, in the absence of state action, unnecessarily suggestive identification procedures conducted by private actors do not violate the defendant's right to due process of law under the federal constitution. See also id., 43 ("[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the [d]ue [p]rocess [c]lause" [internal quotation marks omitted]). In *Perry* v. *New Hampshire*,     U. S.    , 132 S. Ct. 716, 730, 181 L. Ed. 2d 694 (2012), the United States Supreme Court reached the same conclusion.[12] Id. ("we hold that the [d]ue [p]rocess [c]lause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances *arranged by law enforcement*"

[emphasis added]). The court in *Perry* reasoned that "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place"; id., 726; and that this rationale "is inapposite in cases . . . in which the police engaged in no improper conduct." Id. Although the unduly suggestive conduct of private parties may affect the reliability of an eyewitness identification, the court in *Perry* concluded that, "[w]here the crucial element of police overreaching is missing, the admissibility of an allegedly unreliable confession is a matter to be governed by the evidentiary laws of the forum . . . and not by the [d]ue [p]rocess [c]lause." (Internal quotation marks omitted.) Id.

In this state, the admissibility of such evidence is governed by *State* v. *Holliman*, supra, 214 Conn. 46. Although this court held in *Holliman* that due process principles under the federal constitution are not implicated by unduly suggestive private conduct; id., 45; it also held that, as a matter of *evidentiary* law, "the criteria established for determining the admissibility of identifications in the due process context are appropriate guidelines by which to determine the admissibility of identifications that result from procedures conducted by civilians." Id., 46. Specifically, this court held that, as an evidentiary matter, when a defendant has claimed that an eyewitness identification was the product of unduly suggestive conduct by a private actor, the court must determine, first, whether that conduct "was unnecessarily suggestive, and second, if it is found to be so . . . whether the identification was nevertheless reliable based on an examination of the totality of the circumstances." (Internal quotation marks omitted.) Id. Thus, while the reliability of an eyewitness identification, or the lack thereof, ordinarily goes to the weight of the evidence, and not its admissibility,[13] unreliable identification evidence that is tainted by unduly suggestive private conduct, like such evidence that is tainted by improper state action, is *inadmissible* under *Holliman*.

The defendant in the present case urges this court to hold that, notwithstanding the decisions of this court in *State* v. *Holliman*, supra, 214 Conn. 45-46, and of the United States Supreme Court in *Perry* v. *New Hampshire*, supra, 132 S. Ct. 730, that unduly suggestive private conduct that taints an identification does not implicate the due process clauses of the federal constitution, such conduct *does* implicate the due process clauses of the *state* constitution because "eyewitness identification evidence is unique in its prevalence, persuasive value, and fragility." Thus, the defendant effectively contends that the criteria for the admission of identification evidence that is tainted by unduly suggestive private conduct that this court adopted in *Holliman* as a matter of *evidentiary* law are constitutionally man-

dated under the state constitution.[14]

"The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled. In *State* v. *Geisler*, [222 Conn. 672, 684–86, 610 A.2d 1225 (1992)], we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." (Internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 261, 3 A.3d 806 (2010).

In the present case, the defendant has not cited, and our research has not revealed, a single case in which a court has concluded that unduly suggestive conduct by a private actor automatically implicates constitutional due process principles. Indeed, every court that has considered this claim has rejected it.[15] Like the United States Supreme Court in *Perry*, these courts have reasoned that, when an identification is rendered potentially unreliable by unduly suggestive private conduct, evidentiary rules ordinarily provide sufficient protection against the admission of unreliable evidence and an unfair trial.[16] The defendant also has not identified any textual differences between our state constitution's due process clauses and the federal constitution, any historical insights into the intent of the framers or any contemporary economic or sociological understandings that support his claim that the due process provisions of the state constitution are implicated whenever an identification has been potentially tainted by unduly suggestive conduct by a private actor.[17] Thus, all of the *Geisler* factors weigh against his claim.

We recognize that this court in *Holliman* did not explain why unduly suggestive private conduct should render an unreliable identification *inadmissible*, whereas other factors affecting the reliability of eyewitness identifications in the absence of improper state conduct go to the weight of the evidence. Nothing in *Holliman* suggests, however, that this court's adoption of the federal due process criteria to resolve the evidentiary question was premised on an undisclosed determination that unduly suggestive private conduct implicates the due process provisions of our state constitution.[18] Rather, it is clear to us that, by providing that unreliable identification evidence involving unduly suggestive private conduct must be *excluded*, *Holliman* goes above and beyond minimal constitutional requirements. Accordingly, we reject the defendant's claim that the due process provisions of the state constitution

are automatically implicated when identification evidence has potentially been tainted by unduly suggestive private conduct.[19] Rather, in the absence of improper state action, the admission of identification evidence implicates due process principles only when the evidence is so extremely unreliable that its admission would deprive the defendant of his right to a fair trial.[20] See footnote 12 of this opinion. Because we have concluded that the defendant's claim that the victim's identification of him as the perpetrator should be suppressed on the ground that it was unduly suggestive does not implicate the state constitution, but is purely evidentiary, and because the defendant did not raise the claim at trial, it is not reviewable. See, e.g., *State* v. *Cromety*, 102 Conn. App. 425, 431, 925 A.2d 1133, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007).

The judgment is affirmed.

In this opinion PALMER, ZARELLA, McDONALD and ESPINOSA, Js., concurred.

[1] We note that § 53a-217 has been amended since the time of the defendant's offenses. See Public Acts 2012, No. 12-133, §19. Those changes, however, are not relevant to this appeal. For purposes of convenience, references herein to § 53a-217 are to the current revision of the statute.

[2] The defendant appealed from the judgment of conviction to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] In the photograph, the defendant is wearing a football jersey with the number twenty-seven printed on it.

[4] Presumably, the "in-house check" that Dixon performed was a search of the police department's records. The photograph of the defendant that Dixon found appears to be a mug shot.

[5] The instruction form was titled "Witness Instructions for Photo Identification," and provided the following instructions: "1. I will ask you to view a set of photographs.

"2. It is as important to clear innocent people as to identify the guilty.

"3. Persons in the photos may not look exactly as they did on the date of the incident, because features like facial or head hair can change.

"4. The person you saw *may* or *may not* be in these photographs.

"5. The police will continue to investigate this incident, whether you identify someone or not." (Emphasis in original.)

[6] It is not entirely clear what evidence the defendant sought to suppress. In his motion to suppress, the defendant asked the trial court to suppress "any reference to the pretrial identification of the accused by such witnesses who were involved in the improper pretrial identification and the in-court identification of the accused by such witnesses who were involved in the improper pretrial identification . . . ." The defendant's reference to the "pretrial identification" was apparently to the victim's identification of the defendant as the perpetrator when the victim was presented with the photographic array prepared by Dixon, and not to the victim's identification of the person in the photograph from the My Space page as the person who shot him. The state contends that, to the extent that the defendant was seeking to suppress the victim's identification of the person who shot him in the My Space photograph, such conduct simply was not unduly suggestive. Because we reject the defendant's claim that a private actor's unduly suggestive identification violates the state constitution, however, we need not address this issue.

[7] After the defendant filed his appeal, we granted permission to the Innocence Project to file an amicus brief.

[8] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

Article first, § 10, of the constitution of Connecticut provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[9] The defendant contends that "[t]he trial court should have, at [a] minimum, reviewed [the victim's] private [identification] to determine whether it was unnecessarily suggestive under *Holliman*." It is not entirely clear to us, however, whether he is attempting to raise an evidentiary claim pursuant to *Holliman* independently from his constitutional claim. To the extent that he is, we decline to review the claim because it is not of constitutional magnitude and was not raised in the trial court. See *State* v. *Bowman*, 289 Conn. 809, 821, 960 A.2d 1027 (2008) (unpreserved evidentiary claim is not reviewable). Moreover, because the defendant did not rely on *Holliman* in the trial court, and presented little evidence at the suppression hearing regarding the suggestiveness of the victim's conduct, but focused instead on the unduly suggestive conduct of the police, the record would be inadequate for review even if the claim were preserved.

[10] This claim is potentially dispositive because, if this court concludes that unduly suggestive conduct by a private actor does not implicate the state constitution, then the defendant's unpreserved claim that the victim's identification of him as the perpetrator should be suppressed on the ground it was unduly suggestive would be a purely evidentiary claim and, therefore, unreviewable. See, e.g., *State* v. *Cromety*, 102 Conn. App. 425, 431, 925 A.2d 1133, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007).

[11] In *State* v. *Golding*, supra, 213 Conn. 239–40, this court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis omitted; footnote omitted.)

The state contends that the defendant's claim that the due process clauses of the state constitution are implicated when an identification has been tainted by the conduct of private actors is not reviewable because the defendant has not provided an analysis pursuant to *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). Although the defendant has not expressly discussed the *Geisler* factors with respect to his claim that the state constitution applies to private conduct, we conclude that his briefing is adequate for this court to review the claim. As we discuss more fully in the body of this opinion, however, we conclude that the defendant's failure to provide any support for this state constitutional claim pursuant to *Geisler* is fatal to his claim. (As we also discuss more fully in footnote 17 of this opinion, the defendant has discussed *Geisler* with respect to his claim that, even if unduly suggestive private conduct does not automatically implicate the state constitution, the *Holliman* framework is constitutionally flawed because it allows the admission of unreliable identification evidence. We also reject that claim.)

[12] In *Perry* v. *New Hampshire*, supra, 132 S. Ct. 723, the United States Supreme Court stated that, in the absence of unduly suggestive procedures by state actors, "[o]nly when evidence is so extremely unfair that its admission violates fundamental conceptions of justice . . . have we imposed a constraint tied to the [d]ue [p]rocess [c]lause. See, e.g., *Napue* v. *Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959) (Due process prohibits the [s]tate's know[ing] use [of] false evidence, because such use violates any concept of ordered liberty.)." (Citation omitted; internal quotation marks omitted.) See also *State* v. *Nordstrom*, 200 Ariz. 229, 241, 25 P.3d 717 (2001) ("[I]t is conceivable that the due process clause prohibits identification testimony that falls below some minimal threshold of reliability when the defendant's right or ability to bring the testimony's weaknesses to the jury's attention is somehow restricted, even though state action is not present. . . . That concern arises when evidence lacking in foundation reaches the jury under circumstances that do not afford a defendant an opportunity to point out its weaknesses." [Citation omitted; internal quotation marks omitted.]), overruled in part on other grounds by *State* v. *Ferrero*, 229 Ariz. 239, 243, 274 P.3d 509 (2012); *People* v. *Blackman*, 110 App. Div. 2d 596, 598, 488 N.Y.S.2d 395 (noting difference between identifications involving police misconduct, which always implicate constitutional due process principles because they involve state action, and identifications involving unduly suggestive private conduct, which implicate due process principles only when identification does not meet "threshold of at least minimal reliability"), appeal denied, 65 N.Y.2d 813, 482 N.E.2d 929 (1985); *State* v. *Hibl*, 290 Wis. 2d 595, 615, 714 N.W.2d 194 (2006) ("[t]here may be

some conceivable set of circumstances under which the admission of highly unreliable identification evidence could violate a defendant's right to due process, even though a state-constructed identification procedure is absent").

To the extent that the defendant in the present case contends that an unreliable identification that is tainted by unduly suggestive private conduct may be excluded even if the evidence was not so extremely unreliable that its admission would deprive him of his right to a fair trial, any such claim is unreviewable because it is not of constitutional magnitude and it was not raised at the suppression hearing or at trial. See, e.g., *Commonwealth* v. *Jones*, 423 Mass. 99, 109, 666 N.E.2d 994 (1996) ("[c]ommon law principles of fairness dictate that an unreliable identification arising from the especially suggestive circumstances of this case should not be admitted"); *People* v. *Marte*, 12 N.Y.3d 583, 590, 912 N.E.2d 37, 884 N.Y.S.2d 205 (2009) ("we do not rule on the possibility that a court, in balancing probative value against prejudicial effect, may find some [identification testimony tainted by unduly suggestive private conduct] so unreliable that it is inadmissible"), cert. denied, 559 U.S. 941, 130 S. Ct. 1501, 176 L. Ed. 2d 117 (2010); *State* v. *Pailon*, 590 A.2d 858, 863 (R.I. 1991) ("It is conceivable that identification evidence might become so unreliable as to fall below the threshold of competence [under ordinary rules of evidence]. . . . This indeed would be a rare occurrence and would involve the question of lack of personal knowledge . . . ." [Citation omitted.]); *State* v. *Hibl*, supra, 290 Wis. 2d 617 ("courts serve a limited gate-keeping function, even for constitutionally admissible eyewitness identification evidence"). Accordingly, the amicus' contention that, as a general evidentiary matter, our courts should evaluate identification evidence for admissibility, and not just weight, is not before us.

[13] See *Perry* v. *New Hampshire*, supra, 132 S. Ct. 723 ("it is the province of the jury to weigh the credibility of competing witnesses" [internal quotation marks omitted]); id., 728 (ordinarily, "the potential unreliability of a type of evidence does not alone render its introduction at the defendant's trial fundamentally unfair"); *State* v. *Guilbert*, supra, 306 Conn. 243–45 (ordinarily, reliability of eyewitness identification is question for jury, subject to testing by cross-examination, closing argument, jury instructions and expert testimony on fallibility of such testimony); *State* v. *Hibl*, 290 Wis. 2d 595, 616, 714 N.W.2d 194 (2006) ("[t]he overwhelming majority of American courts have always treated the evidence question [relating to eyewitness identifications] not as one of admissibility but as one of credibility for the jury" [internal quotation marks omitted]).

[14] The defendant also contends that the evidentiary rule of *Holliman* must be treated as a constitutionally mandated rule because: (1) unlike constitutional claims, evidentiary claims cannot be raised on appeal pursuant to *Golding* if they were not preserved in the trial court; and (2) the burden is on the defendant to prove on appeal that an evidentiary error was harmless, while the burden is on the state to prove that a constitutional violation was harmless. If there is no reason to treat a claim involving identification evidence that was potentially tainted by unduly suggestive private conduct as a constitutional claim at trial, however, there is no reason to treat it as a constitutional claim on appeal.

[15] See *People* v. *Marte*, 12 N.Y.3d 583, 588–89, 912 N.E.2d 37, 884 N.Y.S.2d 205 (2009) (citing cases), cert. denied, 559 U.S. 941, 130 S. Ct. 1501, 176 L. Ed. 2d 117 (2010).

[16] See *Commonwealth* v. *Jones*, 423 Mass. 99, 109–110, 666 N.E.2d 994 (1996); *State* v. *Chen*, 208 N.J. 307, 326, 27 A.3d 930 (2011); *People* v. *Marte*, 12 N.Y.3d 583, 589, 912 N.Y.2d 37, 884 N.Y.S.2d 205 (2009), cert. denied, 559 U.S. 941, 130 S. Ct. 1501, 176 L. Ed. 2d 117 (2010); *State* v. *Pailon*, 590 A.2d 858, 863 (R.I. 1991); *State* v. *Hibl*, 290 Wis. 2d 595, 615, 714 N.W.2d 194 (2006).

[17] The defendant has briefed *Geisler* with respect to his claim that the *Holliman* criteria are constitutionally deficient because the factors for determining reliability of an identification that has been tainted by unduly suggestive police procedures set forth in *Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and *Manson* v. *Brathwaite*, supra, 432 U.S. 113–14—on which *Holliman* relied—have been undermined by recent scientific research. See *State* v. *Holliman*, supra, 214 Conn. 46 (citing *Manson*). He concedes that the only factor that favors his position is the sixth factor, contemporary economical and sociological considerations. See *State* v. *Ledbetter*, 275 Conn. 534, 566, 881 A.2d 290 (2005) (sixth *Geisler* factor favored defendant because uncontradicted scientific literature cited by defendant suggests that *Biggers* framework for determining reliability of identification evidence was flawed), cert. denied, 547 U.S. 1082, 126

S. Ct. 1798, 164 L. Ed. 2d 537 (2006); see also *State* v. *Guilbert*, supra, 306 Conn. 252–53 n.33 (acknowledging that *Biggers* framework has been called into question, but declining to resolve question of whether framework violates state constitution because case did not involve unduly suggestive identification procedures); *State v. Outing*, supra, 298 Conn. 61–62 (noting that *Biggers* framework has been called into question by recent scientific studies, but declining to address issue because defendant had not proved unduly suggestive conduct); *State* v. *Henderson*, 208 N.J. 208, 288–92, 299, 27 A.3d 872 (2011) (rejecting *Biggers* framework when identification had been tainted by unduly suggestive police conduct and adopting new evidentiary framework for determining overall reliability of identification evidence). As we have indicated, however, unlike *Ledbetter* and *Outing*, in which due process principles were implicated because the cases involved state action, *Holliman* created an evidentiary rule. Even if we were to assume that the application of the *Manson/Biggers* framework would not meet state constitutional requirements for reliability in a case involving unduly suggestive police procedures, a question that this court has not yet decided; see *State* v. *Guilbert*, supra, 252–53 n.33; it would not follow that that framework is so likely to allow the admission of *extremely* unreliable identification evidence that its application would be unconstitutional even in the absence of improper state action. See footnote 12 of this opinion (citing cases holding that, in absence of improper state action, admission of identification evidence implicates due process principles only when evidence is extremely unreliable). Moreover, the defendant has cited no authority for the proposition that the due process clauses of the state constitution mandate a higher standard of reliability for the admission of identification evidence that has not been tainted by improper state action than the federal constitution. Accordingly, we reject this claim.

We emphasize that, as a matter of *evidentiary* law, nothing would prevent this court from revising the *Holliman* criteria by rejecting the *Manson/Biggers* framework in favor of a framework that would require a more searching inquiry into the reliability of identification evidence that was potentially tainted by unduly suggestive private conduct. The defendant in the present case, however, did not raise such an evidentiary claim either in this court or in the trial court, but claims only that this more searching inquiry is constitutionally required.

[18] By adopting a stricter rule for unduly suggestive private conduct, this court implicitly rejected the reasoning of the United States Supreme Court in *Perry* v. *New Hampshire*, supra, 132 S. Ct. 727, that "[t]here is no reason why an identification made by an eyewitness with poor vision, for example, or one who harbors a grudge against the defendant, should be regarded as inherently more reliable, less of a 'threat to the fairness of trial,' " than an identification that was tainted by unduly suggestive private conduct. See also *People* v. *Marte*, 12 N.Y.3d 583, 589, 912 N.E.2d 37, 884 N.Y.S.2d 205 (2009) ("We acknowledge, as many courts have, the real possibility that suggestiveness that is not of police origin can contribute to misidentifications. But suggestiveness is only one of the possible sources of such mistakes. A witness to whom no one has made any suggestion can be mistaken for any one or more of many reasons—an inadequate opportunity to observe, bias, panic, racial stereotyping, difficulty in focusing on an attacker's features, or simple bad memory, among others. Where no one in law enforcement is the source of the problem, nothing justifies the per se rule [the] defendant seeks."), cert. denied, 559 U.S. 941, 130 S. Ct. 1501, 176 L. Ed. 2d 117 (2010). In other words, if this court in *Holliman* had applied the reasoning of *Perry*, instead of applying the same criteria for admissibility that it applies in cases involving unduly suggestive procedures by state actors, it would have subjected the identification to the same evidentiary rules that generally apply to eyewitness identifications, which are designed primarily to test reliability. As we have explained, the rationale for *excluding* unreliable identifications involving unduly suggestive conduct by state actors is to punish and to deter improper governmental conduct, not to prevent the jury from considering unreliable evidence. See *Perry* v. *New Hampshire*, supra, 726. Because such deterrence is not an issue in cases involving private conduct, the reasons for this court's holding in *Holliman* are unclear. Accordingly, we do not necessarily disagree with Chief Justice Rogers' concurring opinion in which she argues that this court should abandon the *Holliman* rule and, instead, hold that potentially unreliable eyewitness identifications resulting from suggestive procedures undertaken by private actors should be evaluated in the same manner as any other potentially unreliable evidence. As Chief Justice Rogers recognizes, however, the issue of the appropriate-

ness of the rule in *Holliman* is not directly presented in the present case and, therefore, the issue is not before us.

[19] It is clear, therefore, that the defendant's claim that the victim's identification of the defendant was inadmissible because it involved unduly suggestive private conduct and the state did not show an independent basis for it; see *State* v. *Gold*, 180 Conn. 619, 656, 431 A.2d 501 (when identification was affected by unduly suggestive police procedures, identification is nevertheless admissible when it has independent basis), cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); is unreviewable because, in the absence of improper state action, any such claim is evidentiary and was not preserved. It is also clear that, contrary to the defendant's claim, the admission of the victim's identification of the defendant did not constitute plain error. See *State* v. *Myers*, 290 Conn. 278, 287, 963 A.2d 11 (2009) (reviewing court "may in the interests of justice notice plain error not brought to the attention of the trial court" [internal quotation marks omitted]); id. (plain error is "patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable" [internal quotation marks omitted]).

[20] In the present case, the defendant does not claim that, even if we disagree with his claim that all unduly suggestive conduct by private actors implicates the due process clauses of the state constitution, the victim's eyewitness identification was so unreliable that it deprived him of his due process right to a fair trial. In any event, because the evidence presented at the suppression hearing focused primarily on the alleged unduly suggestive police procedures and not on the factors affecting the reliability of the victim's identification, any such constitutional claim would not be reviewable pursuant to *Golding* due to the lack of an adequate record.

The amicus contends that the *Holliman* evidentiary criteria are inadequate to protect against unreliable identification evidence because "courts frequently 'end the inquiry' after determining that federal due process [principles do] not apply, and, as a result, never examine the reliability of eyewitness identifications that are not unnecessarily suggestive" as an evidentiary matter. Nothing prevents a defendant, however, from raising *both* a due process claim based on unduly suggestive police procedures (or a *Holliman* claim, in the case of unduly suggestive private conduct) *and* a traditional evidentiary claim, in which case the trial court must apply traditional evidentiary criteria to the evidence even if it finds no unduly suggestive conduct. See footnote 12 of this opinion. In addition, as we have indicated, even in the absence of unduly suggestive conduct by a state or private actor, a defendant may raise a claim that the identification evidence was so unreliable that its admission would violate his due process right to a fair trial.